THE CITY OF CINCINNATI, APPELLEE, *v.* TESTA, TAX COMMR., APPELLANT.

[Cite as *Cincinnati v. Testa*, 143 Ohio St.3d 371, 2015-Ohio-1775.]

(No. 2014–0531—Submitted February 25, 2015—Decided May 14, 2015.)

FRENCH, J.

{¶ 1} This appeal addresses a claim of exemption from real-property tax for several golf courses owned by appellee, the city of Cincinnati, and operated under a management contract by a private, for-profit contractor, Billy Casper Golf Management, Inc. ("Golf Management"). Paul Macke, a private golf-course operator who owns taxable real property in Hamilton County, challenged the ongoing exemption of the courses as public property used exclusively for a public purpose. After reviewing Macke's complaints, appellant, the Ohio tax commissioner, determined that the exemption should be revoked and that the golf courses should be subject to real-property tax. Cincinnati appealed to the Board of Tax Appeals ("BTA"), which reversed the commissioner's determination and allowed the exemption.

{¶ 2} On appeal to this court, the tax commissioner contends that Cincinnati's contractual arrangement with a for-profit company to manage and operate the golf courses defeats the tax exemption under R.C. 5709.08 on the grounds that the golf courses are no longer public property used exclusively for a public purpose. We disagree with the tax commissioner, and we affirm the BTA's reasonable and lawful decision.

*Facts and procedural background*

{¶ 3} Cincinnati owns the golf courses at issue here, and pursuant to the city charter, the Cincinnati Recreation Commission ("CRC") has the right to furnish, equip, and operate the city-owned golf courses. CRC operates the golf courses as part of its "mission * * * to provide recreational and cultural activities enhancing health and wellness [and] creating a sense of community * * * for everyone that lives in the City of Cincinnati and the tri-state area."

{¶ 4} The issue of the golf courses' exemption from real-property taxation has arisen since CRC began contracting with private companies to manage and operate the courses. In 2003, CRC entered into a management contract with its

current contractor, Golf Management. A subsequent management contract between CRC and Golf Management was executed in 2011 and certified in 2012.

{¶ 5} The management contracts recite the city's ownership and operation of seven (later six) public golf courses and express the city's "desire[ ] to obtain management services." The management contracts require Golf Management to provide a defined "scope of services," as set out in a 25–page exhibit. In general, Golf Management's services include "normal supervisory[,] management and operational services associated with public golf courses in a municipal setting." More particularly, Golf Management's duties include the following: (1) "exclusive responsibility and control over all areas and structures within the boundaries of the golf premises," (2) supervision of golf clubhouse operations, including the sale of golf merchandise, golf cart operations, and golf programs, (3) establishment and implementation of "a grounds maintenance program, and agronomic and horticultural operations to assure the proper playing conditions," and (4) provision of human-resources services for golf-course employees, all of whom are employees of Golf Management.

{¶ 6} The management contracts require Golf Management to deposit all golf-course proceeds except sales of food and beverages, merchandise, and golf lessons into a CRC account, to be disbursed in accordance with the CRC's protocols and procedures. As the BTA found, CRC receives all golf-course operating revenues, including greens fees and cart-rental fees.

{¶ 7} Payments under the management contracts run in two directions: CRC pays Golf Management a monthly management fee, and Golf Management pays CRC a percentage of gross food, beverage, and merchandise sales. The 2003 contract called for a monthly management fee of $16,666.66, and the 2012 contract called for a monthly management fee of $13,750.[1] Both contracts offer Golf Management an incentive fee for achieving a revenue target, but that target has never been hit. With respect to food and beverage sales, the 2003 contract required Golf Management to annually pay CRC the greater of 17 percent or $200,000, and the 2012 contract required a payment of the greater of 20 percent or $220,000. Finally, the 2003 contract required Golf Management to pay 7 percent of the golf-shop merchandise sales to CRC; the 2012 contract required payment of 10 percent of merchandise sales.

{¶ 8} Pursuant to section 14 of the 2003 contract, Golf Management was an independent contractor. The 2012 contract, however, amended that section and states, "In operating the Golf Courses, entering into cont[r]acts relating to the Golf Courses, the Contractor acts on behalf of and as an agent for the [CRC]."

---

1. The 2012 contract involved only six golf courses; the 2003 contract involved seven.

{¶ 9} Macke challenged the golf courses' ongoing exemption from real-property tax in complaints filed at various times in 2009 and 2010. The tax commissioner issued final determinations in December 2010 and, in each case, granted the complaint and denied exemption. The tax commissioner relied on the following factors: (1) the alleged generation of profits by the golf courses, (2) Golf Management's status as an independent contractor, (3) the "privatization" of the courses evidenced by waiver of city living-wage requirements, and (4) the supposed competition with private golf courses.

{¶ 10} Cincinnati appealed to the BTA, which consolidated the cases and held a hearing on May 7, 2013. Cincinnati offered as evidence the 2003 and 2012 management contracts, along with other documents and the testimony of three persons: (1) Christopher Bigham, CRC's director, (2) Steve Pacella, superintendent of administrative services for CRC, and (3) Joseph Livingood, senior vice president of Golf Management. The tax commissioner offered brief testimony from Macke and introduced documentation, including Cincinnati's request for proposals ("RFP") for golf-management services, Golf Management's 2002 response to the RFP, and documents relating to financial matters.

{¶ 11} On March 6, 2014, the BTA issued a consolidated decision reversing the tax commissioner's denial of exemptions based on two main considerations. First, the BTA rejected the tax commissioner's reliance on *Parma Hts. v. Wilkins*, 105 Ohio St.3d 463, 2005-Ohio-2818, 828 N.E.2d 998. The BTA distinguished *Parma Hts.* based on the lack of a lease between CRC and Golf Management and the terms of the management contracts. BTA Nos. 2011–143 through 2011–148, 2014 WL 1155680, *3 (Mar. 6, 2014). The board found that Cincinnati, via CRC, exercises "significant authority" over the golf courses and that Golf Management "simply carries out the day-to-day operations of the courses according to CRC's direction and control." *Id.* Second, the board noted that Cincinnati reaps the financial benefit of most of the golf-course revenues, including all operating revenues, and that Golf Management's revenues from food, beverage, and merchandise sales are "incidental" under the authority of *South–Western City Schools Bd. of Edn. v. Kinney*, 24 Ohio St.3d 184, 494 N.E.2d 1109 (1986). Finally, the BTA noted that Cincinnati, not Golf Management, is responsible for the payment of real-property taxes and that, unlike the exemption in *Parma Hts.*, the exemption here will benefit the city, not a private entity.

{¶ 12} The tax commissioner appealed to this court, pursuant to R.C. 5717.04. Macke also filed a notice of appeal, but he failed to perfect his appeal as required by statute, and we therefore dismissed his notice of appeal and redesignated his briefs as amicus briefs in support of the tax commissioner's position. 141 Ohio St.3d 1465, 2015-Ohio-428, 24 N.E.3d 1183.

*Analysis*

{¶ 13} The BTA's findings of fact are entitled to deference. *Satullo v. Wilkins,* 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, citing *Am. Natl. Can Co. v. Tracy,* 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995). This court will not reverse the BTA's determination as to the credibility of witnesses and the weight to be given to their testimony absent an abuse of discretion. *EOP–BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision,* 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 14. Legal issues attending the manner in which statutes have been construed and applied, however, call for de novo review. *Akron Centre Plaza, L.L.C. v. Summit Cty. Bd. of Revision,* 128 Ohio St.3d 145, 2010-Ohio-5035, 942 N.E.2d 1054, ¶ 10.

{¶ 14} In Ohio, taxation is the rule, and exemption is the exception. *Vought Industries, Inc. v. Tracy,* 72 Ohio St.3d 261, 264, 648 N.E.2d 1364 (1995), citing *Cleveland v. Bd. of Tax Appeals,* 153 Ohio St. 97, 99–100, 91 N.E.2d 480 (1950). The well-established rule in tax-exemption cases—generally articulated in cases involving a property owner's application for an exemption—places the burden on the taxpayer to show that the exemption statute's language clearly expresses the exemption in relation to the claim. *Anderson/Maltbie Partnership v. Levin,* 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 16. But when a taxpayer, like Macke here, challenges the continued exemption of real property, "the burden of proof is upon the complaining taxpayer to produce sufficient evidence to substantiate his allegations that the property should lose its exemption." *Vick v. Cleveland Mem. Med. Found.,* 2 Ohio St.2d 30, 206 N.E.2d 2 (1965), paragraph one of the syllabus.

{¶ 15} The issue before us is whether the statutes allow the exemption for the golf courses in light of the largely undisputed facts. This presents a question of law for our plenary review. *See Equity Dublin Assocs. v. Testa,* 142 Ohio St.3d 152, 2014-Ohio-5243, 28 N.E.3d 1206, ¶ 22.

{¶ 16} The tax commissioner's first proposition of law states that tax-exemption statutes "must be strictly construed, because exemptions are in derogation of the rights of all other taxpayers." This is a correct statement of the law with which Cincinnati agrees. *See, e.g., Panther II Transp., Inc. v. Seville Bd. of Income Tax Rev.,* 138 Ohio St.3d 495, 2014-Ohio-1011, 8 N.E.3d 904, ¶ 23. But, as Cincinnati states, interpretation of tax-exemption statutes must also be reasonable and not defeat the legislative intent. *In re Estate of Morgan,* 173 Ohio St. 89, 93, 180 N.E.2d 146 (1962). With these standards in mind, we turn to the statutory authority for the tax exemption in this case.

{¶ 17} All real property in Ohio is subject to taxation unless expressly exempted. R.C. 5709.01(A). At issue here is the exemption stated in R.C. 5709.08(A)(1) for "public property used exclusively for a public purpose." Prop-

erty qualifies for that exemption when it satisfies three prerequisites: "(1) the property must be public property, (2) the use thereof must be for a public purpose, and (3) the property must be used exclusively for a public purpose." *Carney v. Cleveland*, 173 Ohio St. 56, 180 N.E.2d 14 (1962), paragraph one of the syllabus. Only the third requirement is at issue here.

{¶ 18} The tax commissioner's second, third, and fourth propositions of law concern the requirement that the golf courses be used exclusively for a public purpose. Collectively, those propositions state that public property is not used exclusively for a public purpose when a for-profit entity operates a for-profit business on the property, in competition with other private entities in the area, with the intent to profit, or as the functional equivalent of a lessee.

{¶ 19} We first look to R.C. 5709.121(A), which declares certain property to be used exclusively for charitable or public purposes and states:

Real property * * * belonging to * * * a political subdivision, shall be considered as used exclusively for * * * public purposes by such * * * political subdivision, if it meets one of the following requirements:

(1) It is used by such * * * political subdivision, or by one or more other * * * political subdivisions under a lease, sublease, or other contractual arrangement:

(a) [As an arts center];

(b) For other * * * public purposes.

(2) It is made available under the direction or control of such * * * political subdivision for use in furtherance of or incidental to its * * * public purposes and not with the view to profit.

The provision most applicable here is R.C. 5709.121(A)(2). Cincinnati makes the golf courses available to golfers who enjoy their accommodations, and the essence of the public purpose is to make the golf courses available for use by the public.

{¶ 20} Under R.C. 5709.121(A)(2), three elements must be satisfied in order to conclude that the golf courses in this case are used exclusively for a public purpose and are, therefore, entitled to a tax exemption. First, they must be "under the direction or control of" Cincinnati. The BTA expressly found that Cincinnati "continues to exercise significant authority over the subject golf courses." BTA Nos. 2011–143 through 2011–148, 2014 WL 1155680, *3. The operation of the courses is subject to extensive supervision by Cincinnati, and CRC had to approve decisions regarding management and operation of the golf courses. For example, CRC retained authority over rate-setting, approval of marketing, and hours of operation. CRC's golf-audit team inspects the courses

weekly, and Rob Williams, the city's supervisor of golf, is in the field inspecting the courses "[b]asically daily." This reliable and probative evidence supports the BTA's finding regarding Cincinnati's ongoing direction and control, and it merits deference.

{¶ 21} Second, the property's use must be "in furtherance of or incidental to [Cincinnati's] public purposes." Bigham testified that CRC operates the golf courses consistent with its mission to "provide recreational and cultural activities enhancing health and wellness." There can be no question that the golf courses continue to be used to make golfing available to the general public. Bigham testified to CRC's mission "to really provide services for everyone." As in *South–Western City Schools,* 24 Ohio St.3d 184, 494 N.E.2d 1109, another case involving the tax-exempt status of a municipal golf course, no one contends that operating golf courses is not a valid public function, and we accept that it is.

{¶ 22} Third, the property must be made available to others not with a view to profit. Satisfaction of this requirement is the primary point of disagreement here. The tax commissioner argues that the golf courses were operated for profit because Golf Management is a for-profit enterprise seeking profit through the management contract and because the golf-course operations were designed to generate sufficient revenue to offset expenses and potentially generate a surplus. Regarding revenue sharing and profit potential, the BTA found as follows:

> Under the management contract, the City receives all operating revenues, including greens fees and cart rentals fees, which it reinvests into the golf facilities. [Golf Management] only receives a flat management fee, a portion of merchandise and food and beverage sales, and may receive an incentive fee if certain revenue targets are met. This is therefore not a situation where a private enterprise is occupying publicly-owned property and profiting thereby; instead, the fruit of [Golf Management's] labor is largely reaped by the City. [Golf Management] receives only a portion of the revenue from merchandise and food and beverage sales * * *. Such revenues are incidental and do not violate the "exclusively for a public purpose requirement" of R.C. 5709.08.

2014 WL 1155680, *3. In so holding, the BTA focused on the proportion of the revenue retained by Golf Management in relation to the revenue generated for CRC's municipal golf fund; the BTA found that Golf Management's share constituted no more than 5 percent of the revenue to the golf fund. Our review confirms that the record supports the BTA's conclusion.

{¶ 23} The tax commissioner argues that the BTA erred by not considering Golf Management's contractual management fee in its comparison, but the BTA

was justified in excluding the management fee from its consideration. The management fee is a flat fee for the service of managing the courses; it does not constitute "profit" that would violate the limitation of R.C. 5709.121(A)(2). The management contracts entitle Golf Management to its management fee regardless of how the golf courses perform.

{¶ 24} The documentation regarding the municipal golf fund is also persuasive. The average revenue per year from 2007 through 2012 was $6,206,508, and the average expenses were $6,365,044, for an average loss of $158,536 per year over the six-year period. The fund sustained itself over this period with the carry-forward of the previous year's balance, together with the surplus realized in two of the six years: 2007 with a $461,651 surplus and 2009 with a $460,344 surplus. Over the long haul, though, the municipal golf fund can fairly be characterized as operating on a close-to-break-even basis.

{¶ 25} Aside from the amount of revenue realized by either Golf Management or the municipal golf fund from operation of the golf courses, when private use of public land is sufficiently incidental to the public purpose, the land may still be characterized as being used exclusively for a public purpose. *Whitehouse v. Tracy,* 72 Ohio St.3d 178, 181, 648 N.E.2d 503 (1995). In *Whitehouse,* a village allowed a local farmer to grow crops for personal profit on portions of a public well field, and this court affirmed the BTA's determination that the farming was not the type of activity that would defeat the tax exemption for the well field, as public property used exclusively for a public purpose. *Id.* at 182. Likewise, in *Carney v. Ohio Turnpike Comm.,* 167 Ohio St. 273, 276, 147 N.E.2d 857 (1958), we held that turnpike service plazas, which were rented to private corporations to sell food, drink, gasoline, and other goods, were "concomitants of the turnpike operation" and that their private operation did not defeat an exemption for public property operated exclusively for a public purpose. Again, in *Cleveland v. Carney,* 172 Ohio St. 189, 196, 174 N.E.2d 254 (1961), we concluded that use of part of a public auditorium and exhibit hall for public parking was "only a small incidental part of the overall use, insufficient to destroy the tax-exempt character of a facility which in the main is used exclusively for a public purpose," despite a statute providing that municipal real property acquired for off-street parking is not tax-exempt. The focus in those cases was not on the revenue realized as a result of the challenged uses, but on the incidental character of the private use in relation to the public purpose. Here, the sales of food, beverages, and merchandise from which Golf Management derived revenue are incidental to the public purpose of making the golf courses available to the general public.

{¶ 26} In *South–Western City Schools,* 24 Ohio St.3d at 186, 494 N.E.2d 1109, we applied a prior version of R.C. 5709.121, and specifically the language now

appearing in subsection (A)(2), to determine that a municipal golf course satisfied an exemption under R.C. 5709.08. We accepted that operation of a municipal golf course serves a public purpose and considered only whether the golf course was used *exclusively* for a public purpose. The school board challenging the exemption argued that the golf course was not used exclusively for a public purpose, because a snack shop, pro shop, and efficiency apartment located on the premises were operated to generate profits or to benefit private persons. We rejected those arguments. We held that the apartment rental ensured that someone would usually be at the golf course during evening hours and was "for a purpose incidental to the course's public purpose and not with a view to profit." *Id.* at 187. We further held that neither the operation of the pro shop nor the operation of the snack shop, which was leased to a private concessioner, violated the requirement that the property be used exclusively for a public purpose. The record contained no evidence of the revenue realized by the pro shop or the snack shop, and we stated that any profit may have been "inconsequential and trivial." *Id.* As in *South–Western City Schools,* and for these reasons, the golf courses meet the requirements for exclusive public use under R.C. 5709.121(A)(2).

{¶ 27} The tax commissioner takes issue with the BTA's reliance on the lack of a lease in this case to distinguish *Parma Hts.,* 105 Ohio St.3d 463, 2005-Ohio-2818, 828 N.E.2d 998, in which this court affirmed the denial of an exemption for a municipally owned ice rink that the city leased to a private entity. The tax commissioner presents a twofold argument. First, he contends that "[t]he presence or absence of a lease agreement between the parties, by itself, has no bearing on whether an R.C. 5709.08 exemption is appropriate." Alternatively, he argues that the relationship between CRC and Golf Management is the functional equivalent of a lessor/lessee relationship and is, therefore, indistinguishable from the relationship between Parma Heights and its lessee.

{¶ 28} The tax commissioner's assertion that the existence or absence of a lease has no bearing on whether an R.C. 5709.08 exemption applies is contrary to this court's precedent. In *Carney v. Cleveland,* 173 Ohio St. 56, 180 N.E.2d 14, at paragraph two of the syllabus, we held that a portion of a city-owned airport leased to private entities was not exempt. The lessees constructed aircraft hangars on the leased premises at their expense, and the hangars remained under the lessees' management and control and were largely, if not exclusively, devoted to the lessees' business. *Id.* at 58. Our holding was based on the principle that under a lease, "an element of ownership passes to the lessees, and such property thereby loses its identity as public property used exclusively for a public purpose." *Id.* at paragraph two of the syllabus. The existence of the lease and the legal effect of the leasehold were central to our holding. More recently, we relied on *Carney* in *Parma Hts.* to affirm the denial of an exemption under

R.C. 5709.08. *Compare Whitehouse,* 72 Ohio St.3d at 180, 648 N.E.2d 503 (although the farmer grew "crops on the [public] property, and, apparently, earn[ed] some minimal profit from this activity," it was "significant that no lease govern[ed] the relationship between the farmer and the village"). While the existence or absence of a lease may not be determinative, it is relevant to whether public property is used exclusively for a public purpose.

{¶ 29} Neither Cincinnati nor CRC entered into a lease with Golf Management. Bigham testified that CRC chose not to lease the golf courses because it wanted to retain control: "We wanted to make sure that we could approve the rates, approve the operation, approve exactly what went on there on a day-to-day basis * * *." Livingood similarly testified that Golf Management did not intend to lease the golf courses from CRC.

{¶ 30} Three circumstances additionally justify rejecting the tax commissioner's argument that the relationship between CRC and Golf Management is the functional equivalent of that between a lessor and lessee. First, the management contracts contain no language granting Golf Management the right of possession and, in particular, the concomitant right to exclude others from the property. Although the contracts grant Golf Management "exclusive responsibility and control over all areas and structures within the boundaries of the golf premises," that language appears in the section of the contract entitled "Scope of Services" and does not amount to a transfer of an element of ownership to Golf Management; the "Scope of Services" details Golf Management's duties, and the grant of control simply confers the authority necessary to carry out those duties. Second, Golf Management did not act as a lessee in possession, inasmuch as it did not limit Cincinnati's access to and supervision of the golf courses. CRC did not require Golf Management's permission to enter onto the properties, and CRC employees went to the golf courses every day. The daily presence of city personnel negates any implication that Golf Management obtained or exercised an exclusive possessory right. Finally, the management contracts most obviously differ from a lease by the absence of any provision for rent, or any other payment that functionally constituted compensation for a right to exercise possession. *See Black's Law Dictionary* 1024 (10th Ed.2014) (defining "lease" as "[a] contract by which a rightful possessor of real property coveys the right to use and occupy the property in exchange for consideration, usu. rent"). The main payment contemplated by the management contracts is a fixed management fee, which CRC pays in consideration for the performance of precisely defined duties. For these reasons, we reject the tax commissioner's argument that Golf Management acted as the functional equivalent of a lessee.

{¶ 31} In a final argument, encompassed within the first proposition of law, the tax commissioner asserts that Cincinnati's method of operating its golf courses

via a private management company harms competitors and taxpayers, with the result that the city's courses are not used exclusively for a public purpose. The commissioner cites testimony from Macke, who complained that Golf Management lowered the greens fees on city golf courses in an effort to "drive people through the door to sell food and beverage."

{¶ 32} With due respect to Macke's difficult position in a city and county that are, as he put it, "saturated" with public golf courses, the decision to lower greens fees does not negate the public purpose of Cincinnati's golf courses. To the contrary, lower greens fees arguably advance the public purpose of making the city courses more accessible to the golfing public. CRC has, in fact, refused a request by Golf Management to increase greens fees when it concluded that a rate increase would harm CRC's public mission. Traditionally, public parks charge little or nothing for the public to access their amenities, and greater access to everyone without regard to their ability to pay constitutes a part of their public mission, not a refutation of it.

{¶ 33} The tax commissioner argues that the city behaved essentially as a commercial golf-course owner and has used the "competitive advantage" of the tax exemption to harm private competition. The testimony demonstrates that private management of Cincinnati's golf courses has reduced Cincinnati's overhead costs. But the fact remains that by lowering costs, Cincinnati can lower fees and still maintain the viability of its golf operations. We cannot accept the theory that those developments are inimical to the public purpose, given that reducing costs enhances public access to the recreational opportunity that Cincinnati is affording.

### Conclusion

{¶ 34} The BTA acted reasonably and lawfully by determining that Cincinnati did not forfeit its exemption under R.C. 5709.08(A) when it hired a private management company to manage its golf courses. We affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, and O'NEILL, JJ., concur.

---

Terrance A. Nestor, Interim City Solicitor, and Marion E. Haynes III, Chief Counsel, for appellee.

Michael DeWine, Attorney General, and Daniel W. Fausey and Daniel G. Kim, Assistant Attorneys General, for appellant.

Wood & Lamping, L.L.P., Jeffrey D. Forbes, and Gregory G. Laux, urging affirmance for amicus curiae city of Mason, Ohio.

Gary F. Franke Co., L.P.A., and William M. Bristol, urging reversal for amicus curiae Paul Macke.