NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

**SLIP OPINION NO. 2016-OHIO-134.**

**CUYAHOGA COUNTY, APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE.**

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cuyahoga Cty. v. Testa,* Slip Opinion No. 2016-Ohio-134.]**

*Taxation—Real property—Exemption—BTA lacked jurisdiction to consider challenge to tax commissioner's evaluation of marina/restaurant separately from public park because notice of appeal failed to specify alleged error based on separate evaluation—Tax commissioner's finding that marina and restaurant were operated "with a view to profit," R.C. 5709.121(A)(2), was determination of fact entitled to deference.*

(No. 2014-0852—Submitted September 1, 2015—Decided January 19, 2016.)

APPEAL from the Board of Tax Appeals, No. 2011-A-843.

_____

**Per Curiam.**

{¶ 1}  This is an appeal from a decision of the Board of Tax Appeals ("BTA"), which affirmed the tax commissioner's denial of an exemption to the marina/restaurant portion of real property that Cuyahoga County acquired in 2004

in conjunction with an adjacent public park. The county sought exemption for the entire property, including both the park and the marina/restaurant, but the tax commissioner invoked his authority under R.C. 5713.04 to order a split between the taxable and exempt portions: the park was declared to be exempt as "public property used exclusively for a public purpose" pursuant to R.C. 5709.08(A)(1), while the marina and restaurant were retained on the taxable-property list.

{¶ 2} The tax commissioner's determination specifically found that "[t]he marina and restaurant operations must be evaluated separately from the public park." The county's notice of appeal to the BTA did not contest that finding, and the BTA affirmed on the primary ground that the marina and restaurant were operated with a view to profit. On appeal, the county asserts that the marina and restaurant, "operated by [the] County with a lakefront park," are exempt because they are "not operated at a profit, nor with a view toward a profit." For the reasons stated below, the county has not preserved its argument that the marina and restaurant should be evaluated together with the park as a unit, and the BTA's finding—that the marina and restaurant when considered separately from the park are not exempt—is neither unreasonable nor unlawful. We therefore affirm.

**FACTUAL BACKGROUND**

*Why the county acquired Whiskey Island*

{¶ 3} Cuyahoga County claims exemption for property generally referred to as "Whiskey Island," an approximately 65-acre[1] lakefront property consisting of two parcels that lie west of Cleveland's downtown at the western side of the mouth of the Cuyahoga River. The county acquired the property in December 2004 from Whiskey Island Partners, L.P. ("Partners"), a for-profit limited partnership, for $6,250,000, and the county simultaneously entered into a contractual agreement,

---

[1] The acreage is stated to be 65 acres on the exemption application and "approximately 65.18 acres" on the sale contract between Whiskey Island Partners, L.P., and the county. The acreage includes above-water and submerged lands.

the "Marina Management Agreement" ("MMA"), by which Partners was hired to manage the marina and restaurant.

{¶ 4} Under the MMA, the county owned the whole property, supervised Partners' management of the marina and restaurant, and developed the park using proceeds from the marina and restaurant.

{¶ 5} John "Tim" McCormack, currently a judge of the Eighth District Court of Appeals, served as a county commissioner from 1996 until the beginning of 2005. The county acquired Whiskey Island in December 2004, near the end of his tenure in that position. He favored the acquisition, and he testified at the hearing before the BTA, detailing the circumstances surrounding the acquisition. As a reason for the purchase, McCormack stated that part of "sav[ing] the city of Cleveland" was to provide access to lakefront public-park property, given that the city traditionally had "turned [its] back on the lake."

{¶ 6} When acquiring Whiskey Island toward the end of 2004, the county's intent was to preserve the green space and to prevent the Port Authority from acquiring it for use as a dumping ground. Although the park was the primary object for acquisition, given the time constraints imposed by the approaching end of McCormack's term, the county purchased the marina and restaurant as well as the park area. "[W]e took the elbows and the knees and the feet as well as the pitiful face," McCormack testified, "because it had to go as a package." At all times the long-term plan of the county, which has no parks department, was to maintain and develop Whiskey Island to the point when the property would be transferred to Cleveland Metroparks for permanent operation by the park system. Citing an article from Cleveland's *Plain Dealer*, the county's merit brief states that Metroparks purchased the property in 2014.

### *Terms of the MMA*

{¶ 7} The MMA provides that Partners would perform a comprehensive set of duties through its own employees for a management fee. The fee is set at 7.5

percent of the gross revenue, which is broadly defined to include all amounts realized from the operations of the marina and restaurant.

{¶ 8} One of Partners' duties under the MMA is to deposit all proceeds in an "agency [bank] account" owned by the county, with Partners as its agent. The management fee is paid from that account, as are operational expenses relating to the marina and restaurant.

{¶ 9} The MMA grants the county the option to sell the marina—but not the park—back to Partners for a stated price of $2,250,000, at any time from the second anniversary of the MMA to the tenth anniversary. In other words, if the county proved unable to sell the totality to Cleveland Metroparks as envisioned, it could retain the park and sell the marina back to Partners.

*Direction and control by the county*

{¶ 10} One of Partners' duties as contractor is to put together an annual budget for the county's approval. All expenditures must be made pursuant to the budget, and except in emergency circumstances, any expenditures beyond the budget must be preapproved by the county.

{¶ 11} The testimony of county officials and personnel associated with Partners generally corroborated the application of this provision in practice. That testimony indicated, as the tax commissioner emphasizes, that the county took a relatively "hands-off" approach and deferred to Partners' judgment given the county's lack of expertise in managing parks and marinas.

*Expenditure of general funds by the county*

{¶ 12} Soon after purchasing the property, the county spent about $2,000,000 on bridge repair for access to Whiskey Island. In addition, the county paid for certain park improvements. Later, the county spent about $23,000 toward a watering system for fire safety. For the most part, however, operational expenses at Whiskey Island were paid out of proceeds from the operations of the marina and restaurant.

*Public accessibility mandated by the MMA and the sale contract*

{¶ 13} The MMA requires Partners to

> keep the Property accessible and open to the general public on a non-discriminating basis during normal days and hours of operation (which shall be no fewer than the days and hours of operation of comparable marinas owned or operated by the MetroParks park system), except for safety and security reasons the docks and areas used by heavy equipment will not be publicly accessible.

This provision parallels the sale contract. Thus, the purchase and operation of the property, including the marina, contemplated accessibility to the general public.

{¶ 14} According to testimony presented at the BTA hearing, some of the dock slips were available to the public. Nancy Keene, an employee of a Partners affiliate who prepared financial statements for the marina, testified that "courtesy docks" were open to the public, with many of them free for short periods. The business was seasonal, but during the summer months the courtesy docks would be full.

*Long-term leasing of dock space: persisting, but limited by contract*

{¶ 15} When Partners began developing the marina in 1993, it entered into long-term leases for dock space—so-called "dockominiums"—as a financing mechanism. Terms were for as long as 99 years.

{¶ 16} The exact percentage of facilities devoted to leased space versus space open to the general public is not attested in the record. McCormack spoke very generally of "scores of leases." But significantly, the sale contract specifically acknowledges that the county as purchaser may wish to buy out existing leases and forbids Partners from entering into any new ones. Partners is also obligated to inform the county of any dockominium leases that become available for sale. The

sale contract specifically provides that Partners' obligations survive the closing and recording of the deed. (Thus, the obligation not to enter into long-term leases of dock slips presumably extended to the assumption of operations by Partners under the MMA.) Consistent with these provisions, the MMA limits Partners' leasing authority by making "[a]ll lease documents containing a term of more than one boating season or 1 year [ ] subject to [the county]'s approval" and requires them to "be executed by [the county]." There is no indication that any new long-term leases were approved or entered into after acquisition by the county.

### PROCEDURAL HISTORY

*Before the tax commissioner*

{¶ 17} The county filed its exemption application on June 21, 2006, and the tax commissioner issued his final determination on February 22, 2011. The commissioner granted the application as to the 38-acre park portion but denied the application as to the remainder, which constituted the marina and restaurant. The commissioner relied on R.C. 5713.04 as authority for splitting the property into taxable and exempt portions.

{¶ 18} Considering the status of the marina under R.C. 5709.08(A)(1), which exempts "public property used exclusively for a public purpose," the final determination first stated that "[t]he marina and restaurant operations must be evaluated separately from the public park." The determination examined the relationship between Partners and the county, finding that the county had "turned over the management of its County-owned marina and restaurant to a for-profit partnership" and that Partners operated as an independent contractor on its own behalf rather than the county's. The case law on which the determination relied most heavily involves property leased to for-profit entities, in particular *Parma Hts. v. Wilkins*, 105 Ohio St.3d 463, 2005-Ohio-2818, 828 N.E.2d 998. The commissioner found that the for-profit character of Partners defeated the exemption claim because the marina and restaurant were operated "with a view to profit."

{¶ 19} The final determination also considered and denied exemption under R.C. 5709.081, which pertains to public recreational facilities. That claim has not been pursued on appeal.

*Before the BTA*

{¶ 20} The county appealed to the BTA on April 21, 2011, contending that the commissioner erred by finding that the property was not used exclusively for a public purpose.

{¶ 21} The BTA held a hearing on July 31, 2013, at which the county presented the testimony of five witnesses, and both sides presented numerous exhibits, including the MMA and the Whiskey Island sale contract.

{¶ 22} On April 25, 2014, the BTA issued its decision, which affirmed the tax commissioner's determination. Unlike the commissioner, the BTA properly cited R.C. 5709.121 as being relevant to determining "exclusive" use for a public purpose.[2] But like the tax commissioner, the BTA relied on the case law concerning leased property, particularly *Parma Hts.*, 105 Ohio St.3d 496, 2005-Ohio-2818, 828 N.E.2d 998. And like the commissioner, the BTA found that the marina and restaurant were used "with a view to profit."

{¶ 23} The county appealed to this court.

## ANALYSIS

*1. The county views the marina and restaurant in conjunction with the park—but we lack jurisdiction to consider that argument*

{¶ 24} There is no dispute in this appeal about the park portion of the Whiskey Island property: the tax commissioner granted exemption to the park

---

[2] Inconsistent with R.C. 5709.121(A)(2) is the BTA's statement in footnote 4 that the degree of control by the county was irrelevant for purposes of exemption. Under R.C. 5709.121(A)(2), "exclusive" use for a public purpose in this case requires that (1) the marina and restaurant be made available " 'under the direction or control of' " the county, (2) the property use be " 'in furtherance of or incidental to [the county's] public purposes,' " and (3) the use be "not with a view to profit." *Cincinnati v. Testa*, 143 Ohio St.3d 371, 2015-Ohio-1775, 38 N.E.3d 847, ¶ 19-22 (quoting R.C. 5709.121(A)(2)).

itself. But the tax commissioner's determination then states that "[t]he marina and restaurant operations must be evaluated separately from the public park." Similarly, the BTA treated the claim of exemption for the marina and restaurant as standing independently of the park.

{¶ 25} Before us, the county contends that the "County-owned marina and restaurant operated by County *with a lakefront park* and not operated at a profit, nor with a view toward a profit, [are] exempt from real property taxation." (Emphasis added.) On the other side, the tax commissioner asserts that because he granted the exemption to the park portion of the property, "the Board's decision correctly reflects that the *only* property at issue in this appeal is the part of Whiskey Island *comprising the marina and restaurant*." (Emphasis sic.) Between us and the consideration of the parties' arguments, however, lies an insuperable obstacle: the county's notice of appeal to the BTA fails to specify the separate treatment of the two uses as error.

{¶ 26} Former R.C. 5717.02 required that a notice of appeal to the BTA from a determination of the tax commissioner "specify the errors therein complained of." 2011 Sub.H.B. No. 225.[3] It is well settled that "the BTA lacks jurisdiction to grant relief from a final determination based on * * * alleged errors that were not sufficiently specified in the notice of appeal." *Brown v. Levin*, 119 Ohio St.3d 335, 2008-Ohio-4081, 894 N.E.2d 35, ¶ 17; *see also Global Knowledge Training, L.L.C. v. Levin*, 127 Ohio St.3d 34, 2010-Ohio-4411, 936 N.E.2d 463, ¶ 15 (specification requirement of R.C. 5717.02 constitutes a "jurisdictional prerequisite[ ] to the exercise of authority by the BTA or this court on appeal"). Moreover, under analogous circumstances, we have held that a specific finding

---

[3] In 2013, the operative language of R.C. 5717.02 was changed. 2013 Sub.H.B. No. 138. The statute now requires a "short and plain statement of the claimed errors in the determination," while granting an option to amend the notice later in the proceedings. R.C. 5717.02(C). Because the notice of appeal to the BTA in this case was filed before the enactment of the 2013 legislation, we apply the earlier version of the statute.

must be challenged explicitly in the notice of appeal in order to vest jurisdiction in the BTA and, ultimately, in this court. *Ellwood Engineered Castings Co. v. Zaino*, 98 Ohio St.3d 424, 2003-Ohio-1812, 786 N.E.2d 458.

{¶ 27} In this case, the parties have not asserted or briefed the issue of our jurisdiction to consider the status of the marina and restaurant in conjunction with that of the park rather than separately, as the tribunals below did. That does not, however, deter us from raising the jurisdiction issue on our own motion. *See Crown Communication, Inc. v. Testa*, 136 Ohio St.3d 209, 2013-Ohio-3126, 992 N.E.2d 1135, ¶ 27 (this court "exercise[s] plenary authority to consider issues that concern the jurisdiction of the tax tribunals"). And we have held that the failure to specify error before the BTA means not only that the BTA lacked jurisdiction but also that on appeal we derive no authority to consider the omitted issue. *See Osborne Bros. Welding Supply, Inc. v. Limbach*, 40 Ohio St.3d 175, 178, 532 N.E.2d 739 (1988).

{¶ 28} We hold that we lack jurisdiction to consider a challenge to the tax commissioner's finding that the marina and restaurant must be evaluated separately from the public park. It follows that the exemption claim may only be considered at this juncture viewing the operation of the marina and restaurant separate and apart from the park.

2. *When the marina and restaurant are considered in isolation from the park, the denial of exemption was neither unreasonable nor unlawful*

{¶ 29} We review the decisions of the BTA to determine whether they are reasonable and lawful. R.C. 5717.04. We have noted that "[t]he standard for conducting that review ranges from abuse of discretion, which applies when we are asked to reverse the BTA's determination regarding credibility of witnesses, to de novo review of legal issues." *Grace Cathedral, Inc. v. Testa*, 143 Ohio St.3d 212, 2015-Ohio-2067, 36 N.E.3d 136, ¶ 16. Like other exemption cases, the situation here calls for the proper construction and application of the statutes, which is a

question of law, commingled with the issue whether the marina and restaurant were operated "with a view to profit," which involves an element of fact-finding.

{¶ 30} The county's appeal confronted the BTA with the issue whether the marina and restaurant, viewed separately from the park, were "used exclusively for a public purpose" by the county. Although the BTA did not mention the statute, in reviewing its determination we necessarily consult R.C. 5709.121, which describes what constitutes an exclusive use. *See Cincinnati v. Testa*, 143 Ohio St.3d 371, 2015-Ohio-1775, 38 N.E.3d 847, ¶ 19. R.C. 5709.121(A)(2) informs us that public property may be considered to be used exclusively for a public purpose when it "is made available under the direction or control of * * * [a] political subdivision for use in furtherance of or incidental to its * * * public purposes and not with the view to profit."

{¶ 31} The tax commissioner has continually stressed the fact that the county originally wanted to purchase only the park but had to take the marina and restaurant as the "elbows and the knees and the feet as well as the pitiful face because it had to go as a package," as former commissioner McCormack colorfully expressed it. Since the county originally viewed the park as the object of its attention to the exclusion of the marina and restaurant, the commissioner reasoned that their taxable status must be looked at separately and that the marina should be judged in the light of its ongoing operation by a for-profit entity to generate revenue and even profit. The BTA essentially adopted this analysis.

{¶ 32} The county forcefully contests the "view to profit" finding, but we hold that under all these circumstances, that finding can be regarded as primarily a determination of fact that merits our deference. After all, the county acquired and managed the marina in order to acquire and develop the park and did not originally have a separate public purpose in mind for the marina. And in fact, the marina over time served as a revenue source for developing the park, thereby raising the inference that its purpose in the eyes of the county was to generate funds for the

park. When considered separately from the park as here it must be, the revenue generated was not merely covering costs; it was "profit" in the sense that the surplus was used for something other than defraying the costs incurred by the marina and restaurant themselves. *See Toledo v. Jenkins*, 143 Ohio St. 141, 152, 54 N.E.2d 656 (1944) ("the mere fact that revenue is received" for parts of a municipal airport rented out to private parties "to promote aviation by extending service at the airport to all the public using its facilities" did "not change the public aspect, so long as the purpose of the utility is subserved and the objective is not primarily to obtain revenue").

{¶ 33} Beyond the "view to profit" finding, however, we find additional support for denying the exemption in the second prong of the test set forth in R.C. 5709.121(A)(2). Namely, the long-term (90-year-plus) leases of docks—referred to as the "dockominiums"—cannot be viewed as a use of property "in furtherance of or incidental to" a public purpose in the qualitative sense. Nor can those leases be seen as a purely de minimis use from a quantitative standpoint here. Long-term leasing of marina facilities, by limiting the general public's access, tends to negate the public purpose of the use. *See Gregory Marina, Inc. v. Detroit*, 378 Mich. 364, 383, 144 N.W.2d 503 (1966) (" 'The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private' "), quoting 37 American Jurisprudence, Municipal Corporations, Section 120, at 735 (1941); Opinion to the Governor, 76 R.I. 365, 369-370, 70 A.2d 817 (1950) ("The promotion of service to the public is considered to be the primary object of such a development [i.e., a marina]," given the underlying principle that "the construction of docks and wharves * * * *for general public use* is a public purpose" [emphasis altered]). Although the county took measures in acquiring the property to limit such long-term leases, their continued existence militates against exemption because it limits public access.

## CONCLUSION

{¶ 34} For the foregoing reasons, we affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Tim McGinty, Cuyahoga County Prosecuting Attorney, and Mark R. Greenfield and Brendan R. Doyle, Assistant Prosecuting Attorneys, for appellant.

Michael DeWine, Attorney General, and Daniel W. Fausey and Daniel G. Kim, Assistant Attorneys General, for appellee.

_____