O’Neill, J.
{¶ 1} The appellant property owner, 250 Shoup Mill, L.L.C. (“Shoup”), applied to exempt real property used as a public “community school” for tax year 2010. Shoup challenges a decision of the Board of Tax Appeals (“BTA”) that affirmed the tax commissioner’s denial of exemption to the property that Shoup leased to *99 the community school. Shoup itself is wholly owned by a 501(c)(3) nonprofit corporation whose members include the very community school to whom the property is leased. Shoup argues that the nonprofit and charitable character of the ownership arrangement decisively distinguishes this case from Anderson/Maltbie v. Levin, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, and that that arrangement should qualify the property for exemption under the public-schoolhouse exemption in former R.C. 5709.07(A)(1). Shoup additionally claims exemption for exclusive charitable use under R.C. 5709.12(B) and 5709.121.
{¶ 2} Both the tax commissioner and the BTA rejected the exemption claims primarily on the grounds that the record showed a “view to profit” on the part of the lessor. The gravamen of Shoup’s argument on appeal is based on the financial arrangement involving Shoup, New Plan Learning, Inc., and the various community schools supported by New Plan that have similar leases on other properties. Under this arrangement, any excess of rental income is used to subsidize the operations of those community schools. Thus, the argument goes, Shoup and New Plan, the sole member of Shoup’s L.L.C., are nonprofit entities that function as nothing more than instrumentalities of the community schools that they serve. Because the income realized by Shoup and New Plan consists of nothing but payments from the very community schools on whose behalf those funds are expended, or to whom they are later distributed, this scheme does not involve a “view to profit.” Through its corporate affiliation and financial interconnection with the community school, Shoup seeks to derive a tax benefit from the public educational nature of its lessee.
{¶ 3} To accept this argument would require us to view the landlord as an adjunct of the community-school tenant. The argument thereby runs into an insuperable legal barrier: the case law that bars a claim of “vicarious exemption,” meaning that the property owner’s entitlement to the exemption must be judged by its own activities, and not by the activities engaged in by the lessee of the property. Under our case law, Shoup is a lessor and nothing more and must be judged on the basis of that activity alone.
{¶ 4} Although Shoup contends that the surpluses realized through the leases should not be viewed as profit and that no intent to profit has been shown, the BTA, in light of the record that is now before us, found that a view to profit was indeed in evidence. Because the findings of fact lie within the BTA’s discretion, and because the record contains sufficient support for its view-to-profit finding, we affirm the decision of the BTA.
The Public-Schoolhouse and Exclusive-Charitable-Use Exemptions
{¶ 5} The first statute at issue here is former R.C. 5709.07(A)(1), which provided as follows:
*100 (A) The following property shall be exempt from taxation:
(1) Public schoolhouses, the books and furniture in them, and the ground attached to them necessary for the proper occupancy, use, and enjoyment of the schoolhouses, and not leased or otherwise used with a view to profit.
2006 Am.Sub.S.B. No. 66, 151 Ohio Laws, Part II, 2868, and Part III, 4397. “Public schoolhouses” was undefined.
{¶ 6} In 2011, the General Assembly amended the exemption extensively. 2011 Am.Sub.H.B. No. 153. The amendment (1) eliminated the phrase “[pjublic schoolhouses,” opting instead for language exempting “[rjeal property used by a school for primary or secondary education purposes,” R.C. 5709.07(A)(1), (2) defined “school” as a public or nonpublic school and explicitly included community schools in the definition of “public school,” R.C. 5709.07(A)(1)(a) and (b), and (3) eliminated the reference to a “view to profit.” But the new language was not in effect for tax year 2010, which is the tax year before the court in this appeal.
{¶ 7} Shoup also claims entitlement to the expanded scope of exemption for exclusive charitable use of the property under R.C. 5709.12(B) and 5709.121. Whereas R.C. 5709.12(B) provides exemption for property “belonging to institutions that is used exclusively for charitable purposes,” R.C. 5709.121(A) provides a broader scope of exemption when the property owner qualifies as a charitable or educational institution.
Factual Background

The property’s ownership and use

{¶ 8} The property at issue is a 41,000-square-foot building located on a 3.7-acre parcel, which was acquired and renovated for use as the Horizon Science Academy-Dayton High School, Inc., an Ohio community (i.e., charter) school. Under a routine arrangement for the Horizon schools, the property is owned by a nonprofit limited-liability company named after the street address: 250 Shoup Mill, L.L.C., in this instance. Shoup itself had a single member, New Plan, which itself is a nonprofit, 501(c)(3) qualified corporation. Shoup qualified as a “disregarded entity” for purposes of federal taxation. See 26 C.F.R. 301.7701-2(c)(2). As a result, Shoup did not separately obtain 501(c)(3) status or file IRS returns separately from the sole member, New Plan; instead, Shoup’s activity as lessor appeared on the Form 990 tax returns for exempt organizations filed by New Plan as the activity of New Plan itself.
*101 {¶ 9} The community school itself is also a nonprofit 501(c)(3) entity. It, along with the other community schools who are tenants of limited-liability companies similar to Shoup, control New Plan as its directors. Thus, the community school/tenants and their landlords are part of a nonprofit, 501(c)(3) “loop” whereby the landlords provide real estate services on behalf of the community schools. Those services include identifying sites for the community schools, qualifying and arranging for construction or renovation loans for the projected schools, and collecting rent in amounts sufficient to make loan payments.
{¶ 10} New Plan’s president explained the arrangement as follows:
We are forming a new charter school. A charter school gets their authorization from the sponsor authorizer. This is a brand new entity. It does not have any track record, no financial history, no operating history, and no money. They go out on the field and they need this facility.
* * *
If they go and talk to the banks, lenders, financial institutions, they ask for three years’ of tax returns. They ask for a down payment. The school doesn’t have neither [sic],
[[Image here]]
* * * They need somebody to help them out. New Plan Learning is an organization. It is controlled by — the charter school tenants comes [sic] into play here.
{¶ 11} In seeking out facilities for a projected community school, New Plan would arrange for loans and supervise construction. It would enter into a lease under which the rent was computed to cover the real estate costs, particularly of paying the loan with a surplus amount, the debt coverage ratio, demanded by the lender. The rent was set at the minimum possible amount. If a tenant school ran into financial difficulty, New Plan deferred rent payments. No tenant was ever notified of past-due rent, hit with a late charge, or evicted for nonpayment. The contrary is true: New Plan would provide affirmative assistance during a troubled period. New Plan would defer rent or even write it off; in one instance, New Plan made a cash donation to help with financial difficulties.
{¶ 12} The lease between Shoup and Horizon Science Academy-Dayton High School, Inc., has a ten-year term with options for three five-year renewals. It provides for a base rent of $33,806.25 per month, with a 3 percent escalation per year. It has typical commercial-lease terms such as fees for late payments and payment-default provisions.
*102 {¶ 13} The record contains financial statements as well. The “gross rental income” of New Plan (from all six properties leased to community schools) for fiscal year 2011 was $2,921,965. The tax commissioner asserts a surplus of $150,412 for Shoup for 2011, but a review of the financial statement indicates that the number is a sum of certain expense amounts, not a net surplus figure.
{¶ 14} The balance sheet indicates a modest surplus overall. The revenue/expense statement for fiscal year 2010 showed an upward “change in net assets” of $168,119, while the 2011 statement showed an upward change of $342,402. Those numbers relate to all of New Plan’s holdings of community-school properties, a total of six properties with a total land value in 2011 of $3,100,288 and a total building value of $19,004,889. The financial statements show modest salary expenses for New Plan’s employees: a total for fiscal year 2010 of $64,980 and for 2011 of $114,432. For tax year 2011 (New Plan’s fiscal year 2012), the Form 990 tax return shows that New Plan’s president’s salary was $80,833.

Tax commissioner proceedings

{¶ 15} Shoup filed its application for exemption on December 10, 2010, seeking exemption with regard to school use beginning August 31, 2009. The application cited R.C. 5709.121 as the proposed basis for exemption, but the tax commissioner’s final determination considered not only a charitable-use exemption but also a public-schoolhouse exemption under former R.C. 5709.07(A)(1). As for the charitable-use exemption, the commissioner rejected the claim based on his finding that the property was used “with a view to profit through leasing at a substantial rent,” and the property owner could not itself be deemed a “charitable institution” for purposes of applying R.C. 5709.121. By the same token, Shoup could not qualify the property for exemption as a public schoolhouse under former R.C. 5709.07(A)(1) because, under the holding of Anderson/Maltbie, the fact that Shoup, “though nominally nonprofit, is primarily acting as a landlord collecting substantial market-rate rent” defeated the claim for exemption.

BTA proceedings

{¶ 16} Shoup appealed to the BTA. The BTA held a hearing in conjunction with two other hearings in related cases involving properties leased to Horizon community schools. At the hearing, Shoup presented the testimony of New Plan’s president along with numerous exhibits.
{¶ 17} In its January 27, 2015 decision, the BTA agreed with the commissioner and rejected the charitable and public-schoolhouse claims of exemption. The BTA first rejected the claim of charitable exemption, finding that leasing to a charitable institution did not constitute a charitable use by the property owner. BTA No. 2011-2226, 2015 WL 731766, *2 (Jan. 27, 2015). Next, the BTA rejected the claim that Shoup could qualify as an “educational institution” based on the *103 activities of the lessee, the community school that conducted its educational activity on the property. Id.
{¶ 18} Finally, the BTA sustained the tax commissioner’s rejection of the public-schoolhouse exemption claim on the grounds that the schoolhouse property was leased with a view to profit. Although the BTA acknowledged the testimony of New Plan’s president that, in the BTA’s words, “the property is leased at a rate expected to cover the mortgage payments, construction costs, soft costs, debt service coverage ratio, and operating expenses,” the BTA nonetheless found that New Plan “does profit from its leases.” Id. at *1, 3. The BTA stated that “[w]hile [New Plan] appears to use the profits to subsidize the operations of other tenant charter schools, it is not the use of any profits that determines the exempt status of the subject properties.” Id. at *3, citing Hubbard Press v. Tracy, 67 Ohio St.3d 564, 566, 621 N.E.2d 396 (1993). The board found it significant that “[i]t does not appear that any excess revenues from a single charter school are held for the future benefit of that certain school,” but rather that “excess revenues are distributed among all of New Plan’s tenant schools,” with the result that the property’s use was “with a view to profit.” Id. For these reasons, the BTA concurred in denying exemption under former R.C. 5709.07(A)(1).
Standard of Review
{¶ 19} In reviewing a decision of the BTA, we do not sit as “a super BTA or a trier of fact de novo.” EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 17, citing Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision, 66 Ohio St.2d 398, 400, 422 N.E.2d 846 (1981). “The BTA is responsible for determining factual issues and, if the record contains reliable and probative support for [the BTA’s] determinations,” we will 'affirm them. Am. Natl. Can Co. v. Tracy, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995).
A View to Profit Defeats a Claim of Exemption Under the PUBLIC-SCHOOLHOUSE AND CHARITABLE-USE PROVISIONS
{¶ 20} As a matter of law, the existence of a “view to profit” in leasing the property to the community schools defeats Shoup’s claim for exemption under any of its alternative theories. First, a “view to profit” in the lease defeats the public-schoolhouse exemption under the express terms of former R.C. 5709.07(A)(1). Anderson/Maltbie, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547. Second, a “view to profit” in connection with the lease forecloses any claim that Shoup’s property use can qualify as an exclusive charitable use directly under R.C. 5709.12(B). Benjamin Rose Inst. v. Myers, 92 Ohio St. 252, 110 N.E. 924 (1915), syllabus (real estate belonging to a charitable institution that is “rented for commercial and residence purposes” is not exempt, although the *104 income arising from such use is devoted wholly to the purpose of the charity); Northeast Ohio Psych. Inst. v. Levin, 121 Ohio St.3d 292, 2009-Ohio-583, 903 N.E.2d 1188, ¶ 15-16. Third, if Shoup cannot demonstrate that its own use of the property as lessor is charitable, it cannot qualify as a “charitable institution” under R.C. 5709.121 because the ownership and leasing of the property is Shoup’s only activity. See Northeast Ohio Psych, at ¶ 14; Rural Health Collaborative of S. Ohio, Inc. v. Testa, 145 Ohio St.3d 430, 2016-Ohio-508, 50 N.E.3d 486, ¶ 23 (“The determination whether a property owner qualifies as a charitable institution under R.C. 5709.121 requires examination of the ‘core activity’ of the institution and determining whether that activity qualifies as charitable for property-tax purposes”).
{¶ 21} In a case like the present one, we consider the BTA’s finding of a view to profit “primarily a determination of fact that merits our deference.” Cuyahoga Cty. v. Testa, 145 Ohio St.3d 157, 2016-Ohio-134, 47 N.E.3d 814, ¶ 32. The BTA acknowledged the testimony of New Plan’s president that rent amounts were calculated to cover expenses, but a cursory review of the financial statements confirms that the rent at the Shoup Mill location, and presumably the other locations as well, exceeded the monthly expenses associated with the property.
{¶ 22} Specifically, the financial statements in the record reveal that Shoup Mill was the payor on a 25-year note for a principal amount of $3,375,000 and that the monthly rent for the Shoup property started at $33,806.25 and amounted during fiscal year 2011 to $34,651.42 per month. For fiscal year 2011, the monthly mortgage-loan payment was $22,979. Even if we assume a debt-service coverage requirement imposed by the lender of 1.2, the total mortgage-loan-related expense per month is no more than 80 percent of the rent amount. Although New Plan incurred additional expenses, the allocation of such expenses to the Shoup Mill property on a monthly basis adds at most a few thousand dollars to the expense side of the ledger; the rent amount still substantially exceeds those expenses. Moreover, the financial statements indicate a steady increase in “net assets” from year to year for New Plan.
{¶ 23} It is well settled that in the context of a claim for a charitable exemption, profit is defined as the excess of price over cost. Am. Soc. for Metals v. Limbach, 59 Ohio St.3d 38, 40, 569 N.E.2d 1065 (1991); see also Seven Hills Schools v. Kinney, 28 Ohio St.3d 186, 187-188, 503 N.E.2d 163 (1986), quoting Webster’s New International Dictionary 1976 (2d Ed.1960) (profit is the “ ‘excess of income over expenditure, as in a business or any of its departments, during a given period of time’ ”). This case law plainly construes as “profit” the revenue generated by a nonprofit entity from one activity in order to fund another, distinctly charitable, activity.
*105 {¶ 24} Given that it was Shoup’s burden to prove its entitlement to an exemption, Newman v. Levin, 120 Ohio St.3d 127, 2008-Ohio-5202, 896 N.E.2d 995, ¶ 30, the BTA was justified in requiring Shoup to show with specificity that the rent did not typically generate a surplus over expenses. And it was neither unreasonable nor unlawful for the BTA to find a view to profit under these circumstances.
{¶ 25} A finding of a view to profit in this case is consistent with this court’s decision in Anderson/Maltbie, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547. “If the lease is intended to generate profit for the lessor, the property does not qualify for exemption; similarly, the property does not qualify for exemption if the lessee’s use is intended to generate profit.” Id. at ¶ 33. It follows that in applying the public-schoolhouse exemption, the BTA properly looked at whether the lessor conducted its operations with a view to profit as a separate issue from whether the community school itself did so.
{¶ 26} Our analysis receives support from the case law that bars a claim of “vicarious exemption,” meaning that the applicant for exemption must prove that its own activities qualify as exempt; it may not rely upon the activities of its customers or, as here, its lessees. See OCLC Online Computer Library Ctr., Inc. v. Kinney, 11 Ohio St.3d 198, 200-201, 464 N.E.2d 572 (1984), citing Joint Hosp. Servs. v. Lindley, 52 Ohio St.2d 153, 370 N.E.2d 474 (1977).
{¶ 27} In OCLC, the applicant sought to exempt its real estate, relying in part upon the assertion that its fee-paying customers were public libraries that benefited from the purchase of its services, which in turn benefited the general public. We rejected the argument on the grounds that it “simply constitutes an attempt by OCLC to obtain a vicarious charitable exemption by virtue of the activities of its customers.” Id. at 200.
{¶ 28} In Joint Hosp. Servs., we addressed a claim for a sales-tax charitable exemption in which several nonprofit hospitals pooled their resources to create a separate nonprofit entity that provided laundry and linen service for the hospitals and several other nonprofit charitable organizations, such as nursing homes. The jointly controlled entity sought exemption for its own purchases on the theory that it qualified as a nonprofit operated exclusively for charitable purposes on account of “its relationship to the health care functions of the institutions it serves,” that relationship being “so immediate, intertwined and necessary, that it effectively engages in the alleviation of illness, disease, or injury.” 52 Ohio St.2d at 155, 370 N.E.2d 474. We rejected the claim, holding that “Appellant’s own functions fail the [charitable purpose] test” inasmuch as the “laundry and linen service in itself neither improves health through alleviating illness, disease or injury, nor constitutes managing a home for the aged.” Id.
*106 {¶ 29} The resemblance of Joint Hosp. Servs. to Shoup’s claim is indisputable; here, the community schools in some sense pool their resources so that excess revenues may be used by New Plan to subsidize all of its tenant schools. Under OCLC and Joint Hosp. Servs., however, Shoup cannot qualify as charitable based on New Plan’s activities, and under Anderson/Maltbie, Shoup cannot qualify for public-schoolhouse exemption so long as it is operated with a view to profit.
{¶ 30} Shoup also argues that any surpluses attained through the leases do not establish the Shoup Mill property as being held with a “view to profit,” because the rent is held to a minimum level. But as discussed, the BTA plainly exercised its discretion as the finder of fact and found Shoup’s proof insufficient.
{¶ 31} Nor can Shoup salvage its claim by drawing the distinction between an “intent to profit” on the one hand and surpluses that occur “unexpectedly and fortuitously” on the other hand. Despite Shoup’s statements disclaiming an intent to profit, the BTA is entitled to draw reasonable inferences from the evidence before it, and we will reverse its findings of fact “only when there is a total absence of evidence to support a particular finding.” HealthSouth Corp. v. Testa, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 14. As we have noted, the record before us contains evidence of a view to profit. Shoup lays great store by New Plan’s ability and willingness to grant rent deferral or rent forgiveness to the community schools, but in the end its ability to do so depends upon the very excess of revenue over expense that, as profit, disqualifies it from exemption.
{¶ 32} The same body of case law leads us to reject the claim that Shoup may qualify as an “educational institution” for purposes of availing itself of the expanded scope of the charitable-use exemption under R.C. 5709.121. Quite simply, Shoup itself is a lessor and does not engage in educational activity. The prohibition of “vicarious exemptions” bars Shoup from relying on the activities of its lessee as a basis for claiming an exemption of its own.
{¶ 33} Finally, the ownership of the property will vest, after the acquisition and renovation loans are paid off, the mortgages are released, and the leases have expired, in New Plan and Shoup, its limited-liability company, rather than in the community school itself. This fact also supports the BTA’s finding of a view to profit in the lease transaction.
Conclusion
{¶ 34} For the foregoing reasons, we affirm the decision of the BTA.
Decision affirmed.
O’Connor, C.J., and Pfeifer and Lanzinger, JJ., concur.
*107 O’Donnell, J., dissents, with an opinion.
Kennedy, J., dissents, with an opinion joined by O’Donnell and French, JJ.