**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *O'Keeffe v. McClain*, **Slip Opinion No. 2021-Ohio-2186.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-2186

O'KEEFFE, APPELLANT, *v*. MCCLAIN, TAX COMMR., ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *O'Keeffe v. McClain*, Slip Opinion No. 2021-Ohio-2186.]

*Real-property taxation—R.C. 3345.17—Entire real-estate parcel used by the Ohio State University ("OSU") to operate the OSU Airport is entitled to exemption under R.C. 3345.17.*

(No. 2020-0134—Submitted January 13, 2021—Decided June 30, 2021.)

APPEAL from the Board of Tax Appeals, No. 2018-482.

_____

STEWART, J.

{¶ 1} In 2016, appellant, John S. O'Keeffe, a Franklin County property owner, filed a complaint challenging the continuing property-tax exemption for a real-estate parcel owned by the state of Ohio and operated as the Ohio State University Airport ("OSU Airport"), also known as Don Scott Field. The tax commissioner denied O'Keeffe's complaint, and the Board of Tax Appeals ("BTA") affirmed that decision. On appeal, O'Keeffe contends that given its use

as of the tax-lien date, the airport parcel does not qualify for exemption; O'Keeffe argues that either the entire airport should be taxed or, at a minimum, certain areas of the parcel should be split-listed as taxable. We affirm the BTA's decision, which continued the exemption for the entire airport parcel.

## I. BACKGROUND
### A. OSU Airport

{¶ 2} The airport sits on a 325.614-acre parcel owned by the state of Ohio. The parcel is in the Dublin City Schools district, but the board of education of that school district is not a party in this case and does not challenge the tax exemption.

{¶ 3} The airport's director, Douglas Hammon, testified at the BTA hearing that the airport is integral to OSU's College of Engineering. In particular, he testified that the airport's financial operations "fall under [his] purview with the finance arm" of that college, and the College of Engineering's finance director confirmed that the "airport" "reports directly to the dean" of that college.

{¶ 4} OSU Airport operates as a full-service airport, meaning that it has all the features of a typical airport, including runways; taxiways; hangars; an air-traffic-control tower; landing, lighting, and communications systems; and car-rental and food services. It also qualifies as a "general aviation airport" under Federal Aviation Administration ("FAA") guidelines, meaning that it offers services 24/7 and must be available to all classes and categories of aeronautical users for which it has certification. General aviation airports are public-use airports that do not have scheduled service or have less than 2,500 annual passenger boardings. https://www.faa.gov/airports/planning_capacity/categories/ (accessed Feb. 25, 2021) [https://perma.cc/2ADR-AWV6], citing 49 U.S.C. 47102(8). According to Hammon, OSU Airport does not qualify as a "commercial service airport," because OSU Airport does not service the passenger airlines but "service[s] anybody other than the airlines."

{¶ 5} The airport's current operations contrast with its modest beginning as a student flight school during the 1940s. According to OSU's "Master Plan Update," which was issued in 1990, the airport was established as a result of OSU's "policy of developing a comprehensive program of aeronautics," which was adopted in 1942. The master-plan update also states that the airport was operated "as a privately owned facility solely for the benefit of the University" prior to 1959 but "was opened to the public following the adoption of an Airport Master Plan on January 12, 1959." According to the 1990 update, the master plan established the policy of receiving federal aid to fund airport improvements.

{¶ 6} For a fee, members of the public may use the airport to store their aircraft; they may also purchase fuel and acquire ancillary flight services from the airport. The airport also leases hangars and office space to large commercial tenants. Hammon testified that the leasing of facilities serves the purpose of making the airport as financially self-sufficient as possible. O'Keeffe presented documents showing airport profit-and-loss statements for fiscal years 2012 and 2017. The statements show net losses for the airport in those years.

{¶ 7} OSU Airport is integrated with OSU's academic programs in the following ways:

- The airport's facilities include classrooms, simulation laboratories, and research facilities, all of which are used by OSU students in various fields of study.
- Classes are held at the airport in such areas as flight education, airport management, airport planning and design, geography, and finance.
- The airport is used in support of (1) 30 bachelor-, masters-, and Ph.D.-degree programs in the College of Engineering, (2) three bachelor-degree programs in the College of Arts and Sciences, and (3) one bachelor-degree program in the Fisher College of Business.

- The College of Engineering uses the airport as a teaching laboratory and for career training.
- OSU students conduct research at a gas-turbine-research lab and an aerospace-research center maintained at the airport.

## B. Course of proceedings

{¶ 8} O'Keeffe filed his complaint against continued exemption under R.C. 5715.27(E) on December 30, 2016.[1]  OSU responded, and in April 2018, the tax commissioner issued his final determination upholding the exemption.

{¶ 9} In that determination, the tax commissioner considered the exempt status of the parcel under R.C. 3345.17, which exempts "property * * * of the boards of trustees * * * of the state universities * * * and of the state held for the use and benefit of any such institution, which is used for the support of such institution."  Relying on two points, the tax commissioner found that the property was exempt under this provision.

{¶ 10} First, the tax commissioner determined that OSU Airport differs from the property at issue in *Columbus City School Dist. Bd. of Edn. v. Testa*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557.  In that case, we reversed the BTA's decision upholding the tax commissioner's grant of exemption for a property, because the property's support of OSU consisted solely of providing OSU with income derived from leasing the property.  In contrast with that case, the tax commissioner in this case concluded that "the airport property is being used in a synergistic relationship between the University and the aviation related uses and enterprises that support the various University programs and course offerings."  Second, the tax commissioner determined that OSU's use of the airport falls within

---

1. As a Franklin County property owner, O'Keeffe had standing to contest OSU's exemption.  R.C. 5715.27(E) (authorizing the filing of complaints against continued exemption by persons authorized to file valuation complaints pursuant to R.C. 5715.19, which authorizes complaints by "[a]ny person owning taxable real property in the county [or property in another county that is in the same taxing district]" where the property at issue is located).

"the broad powers granted to it as a state university," which include " 'facilitat[ing] and assist[ing] with establishing and developing entrepreneurial projects or * * * assist[ing] and cooperat[ing] with any governmental agency in achieving such purpose,' " quoting R.C. 3345.36(B).

{¶ 11} O'Keeffe appealed the grant of continued exemption to the BTA, which affirmed the tax commissioner's determination. The BTA ruled that "while O'Keeffe must show that the commissioner's findings were in error, OSU must continue to establish its right to exemption." BTA No. 2018-482, 2019 WL 7476573, *2 (Dec. 31, 2019). On the merits, the BTA determined that (1) the state-university property-tax exemption, R.C. 3345.17, does not involve a primary- or exclusive-use test as advocated by O'Keeffe, (2) an operational relationship between the property's use and university activities exists and furnishes an adequate basis for the exemption, and (3) using the property to generate income does not defeat exemption so long as that use is ancillary to the main use. *Id*. at *3. O'Keeffe has appealed the BTA's decision to this court.

## II. PRELIMINARY MATTERS

### A. Standard of review

{¶ 12} We review BTA decisions to "determine whether they are reasonable and lawful." *Grace Cathedral, Inc. v. Testa*, 143 Ohio St.3d 212, 2015-Ohio-2067, 36 N.E.3d 136, ¶ 16, citing R.C. 5717.04. "The standard for conducting that review ranges from abuse of discretion, which applies when we are asked to reverse the BTA's determination regarding the credibility of witnesses, to de novo review of legal issues." *Id*. O'Keeffe's appeal presents mainly legal issues concerning the scope of exemption under R.C. 3345.17. Our review, then, is de novo. *See Progressive Plastics, Inc. v. Testa*, 133 Ohio St.3d 490, 2012-Ohio-4759, 979 N.E.2d 280, ¶ 15.

### B. Burden of proof

{¶ 13} OSU argues that a complainant in O'Keeffe's position bears the burden of proving that the property is not entitled to exemption. At oral argument, the tax commissioner also embraced this position. They are mistaken. The General Assembly has directly addressed the burden of proof in real-property-tax-exemption cases. R.C. 5715.271 states:

> In any consideration concerning the exemption from taxation of any property, the burden of proof shall be placed on the property owner to show that the property is entitled to exemption. The fact that property has previously been granted an exemption is not evidence that it is entitled to continued exemption.

{¶ 14} That statute was enacted in 1985. Am.Sub.H.B. No. 321, 141 Ohio Laws, Part II, 3243, 3245. Before 1985, we had held that "the burden of proof is upon the complaining taxpayer to produce sufficient evidence to substantiate his allegations that the property should lose its exemption." *Vick v. Cleveland Mem. Med. Found.,* 2 Ohio St.2d 30, 206 N.E.2d 2 (1965), paragraph one of the syllabus. The enactment of R.C. 5715.271 supersedes that holding and places the burden of proof of exemption on the property owner, regardless of whether the property owner is applying for exemption or defending against a complaint to discontinue exemption under R.C. 5715.27.[2]

---

2. We relied on the holding in *Vick* in *Cincinnati v. Testa*, 143 Ohio St.3d 371, 2015-Ohio-1775, 38 N.E.3d 847, ¶ 14, a case in which a competitor of the city of Cincinnati's public golf courses filed a complaint against their continued exemption from real-property tax. In light of R.C. 5715.271, we erred by doing so. But our reliance on *Vick* in our opinion in *Cincinnati* has no force as a precedent here, because our opinion in that case neither cited R.C. 5715.271 nor considered its effect on the burden of proof. "When an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises." *Natl. Cable Television Assn., Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1581 (Fed.Cir.1991); *see also United Food & Commercial Workers Union v. Albertson's Inc.*, 207 F.3d 1193, 1199-1200 (10th Cir.2000); *accord State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 120 Ohio St.3d 386, 2008-Ohio-6254, 899

{¶ 15} Under his first proposition of law, O'Keeffe acknowledges that the BTA correctly stated that under R.C. 5715.271, "O'Keeffe must show that the commissioner's findings were in error [and] OSU must continue to establish its right to exemption." But O'Keeffe suggests that the BTA did not properly apply the burden, because it allegedly "fail[ed] to review" his complaint in light of "documented evidence demonstrating substantial material change in operational use since the exemption was first granted in 1943." We conclude, however, that this objection pertains not to the BTA's application of the burden of proof, but to its rejection of O'Keeffe's legal argument.

{¶ 16} In sum, R.C. 5715.271 places the burden of proving entitlement to continued exemption on OSU, and the BTA properly required OSU to bear that burden.

### C. OSU failed to cross-appeal the BTA's evidentiary rulings

{¶ 17} OSU argues that certain documents and testimony ought to have been excluded or disregarded by the BTA. There are three elements to OSU's evidentiary argument: (1) the lack of authentication of certain documents, (2) the hearsay character of unauthenticated documents, and (3) the lack of relevance of certain documents and testimony.

{¶ 18} We reject OSU's evidentiary contentions. These arguments relate to objections OSU raised before the BTA, and in its decision, the BTA clarified that it overruled those objections. 2019 WL 7476573 at *1. OSU forfeited any right to contest that ruling by failing to file a cross-appeal. *See Polaris Amphitheater Concerts, Inc. v. Delaware Cty. Bd. of Revision*, 118 Ohio St.3d 330, 2008-Ohio-2454, 889 N.E.2d 103, ¶ 14 (this court is not permitted "to rectify an alleged error of the BTA unless that error was set forth in a proper notice of appeal, even if the alleged error aggrieved the party only because of the success of another party's

---

N.E.2d 975, ¶ 38-39 (because certain claims were not actually litigated and determined by this court in earlier decisions, those decisions were not binding precedent as to those claims).

appeal"). As a result, we lack jurisdiction to grant any relief to OSU on its evidentiary arguments because it failed to file a cross-appeal setting forth its claims of error.

## III. OSU PROVED THAT THE AIRPORT IS ENTITLED TO EXEMPTION UNDER R.C. 3345.17

### A. The continued exemption of property depends not on whether its use has changed but on whether its current use is exempt

{¶ 19} O'Keeffe contends in his first proposition of law that an exemption may be defeated if the complainant demonstrates "substantial material change in operational use of the property since original exemption was granted." We disagree. When an application for exemption or a complaint against exemption has been filed, R.C. 5715.27(F) requires the tax commissioner to "determine whether the property is subject to taxation or exempt therefrom." This plain language requires the tax commissioner to determine the property's entitlement to exemption without regard to whether the current use of the property differs from an earlier use or whether the property qualifies for exemption under the same provision of law as it did at an earlier date. Although we construe exemptions strictly, "we will not require more qualifications for an exemption than the General Assembly does." *Newfield Publications, Inc. v. Tracy*, 87 Ohio St.3d 150, 153, 718 N.E.2d 420 (1999). The proper inquiry when a complaint against exemption has been filed is whether the property now qualifies for exemption under a currently valid exemption statute.

{¶ 20} O'Keeffe relies on *Vick*, 2 Ohio St.2d 30, 206 N.E.2d 2, to establish that he can defeat exemption by showing "material change." But *Vick* is inapposite. In *Vick*, a hospital had originally been exempted as a charitable-use property and its defense to an exemption challenge was that the same charitable use was continuing. Thus, a showing of material change would have undermined the hospital's defense. By contrast, in this case, OSU is claiming that the airport is

8

entitled to exemption under R.C. 3345.17, which was not in effect at the time of the airport's original exemption in 1943; the original version of R.C. 3345.17 was enacted in 1963. Am.S.B. No. 271, 130 Ohio Laws, Part I, 783, 1515. Nothing in R.C. 5715.27 authorizes stripping property of its exempt status just because it no longer qualifies for an exemption it once qualified for, as long as that property currently qualifies for an exemption that is in effect. We reject O'Keeffe's first proposition of law.

**B. The property qualifies for exemption because it is (1) property of the state, (2) held for the benefit of OSU, and (3) used for the support of OSU**

{¶ 21} Under his second proposition of law, O'Keeffe challenges the BTA's determination that OSU demonstrated entitlement to exemption under R.C. 3345.17. That statute provides:

> All property, personal, real, or mixed of the boards of trustees and of the housing commissions of the state universities, the northeast Ohio medical university, and of the state held for the use and benefit of any such institution, which is used for the support of such institution, is exempt from taxation so long as such property is used for the support of such university.

As previously noted, the original version of R.C. 3345.17 was enacted in 1963, some 20 years after OSU first obtained exemption for the airport property. And the current version of the statute, as did the original version, authorizes exemption for property of the state "held for the use and benefit of [a state university], which is used for the support of such institution."

*1. O'Keeffe forfeited the argument that the exemption fails because of the property title's failure to identify OSU*

{¶ 22} O'Keeffe suggests that the exemption fails because the property is titled to the state of Ohio, without any mention that it is held for the use and benefit of OSU. OSU asserts that because O'Keeffe failed to raise this alleged error when he filed his notice of appeal with the BTA, neither the BTA nor this court has jurisdiction to sustain O'Keeffe's appeal on that basis. *See* R.C. 5717.02(C); *Cuyahoga Cty. v. Testa*, 145 Ohio St.3d 157, 2016-Ohio-134, 47 N.E.3d 814, ¶ 26. The BTA agreed with OSU on this point, 2019 WL 7476573 at *2, and so do we.

*2. R.C. 3345.17 permits exemption based on an operational relationship between the use of the airport and OSU's activities, subject to a primary-use test*

{¶ 23} O'Keeffe's main argument under his second proposition of law pertains to the doctrine of primary and secondary uses of property, which was developed in the case law interpreting R.C. 3345.17. In essence, O'Keeffe argues that taxable noneducational uses of the airport have become primary and the educational uses have become secondary, thus rendering the property nonexempt.

{¶ 24} O'Keeffe's argument under this proposition of law is correct in two important respects. First, the case law predicates exemption under R.C. 3345.17 on the operational relationship between the use of the property and university activities. *Columbus City School Dist.*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557, at ¶ 27. And second, the case law also subjects exemption claims under R.C. 3345.17 to a primary-use test. *Ohio State Univ. Bd. of Trustees v. Kinney*, 5 Ohio St.3d 173, 174, 449 N.E.2d 1282 (1983); *see also State for Use of Univ. of Cincinnati v. Limbach*, 51 Ohio St.3d 6, 553 N.E.2d 1056 (1990); *Columbus City School Dist.* at ¶ 27.

{¶ 25} In *Kinney*, OSU had acquired a parcel of land adjacent to OSU Airport; on part of the parcel stood a house that the university leased to people who had no connection to OSU, with rent going into the university's general fund. In upholding the claim of exemption under R.C. 3345.17, the BTA and this court identified the main uses of the property to be a control zone for the airport and an

expanded facility for OSU's College of Agriculture. We stated that "[p]roperty used for academic purposes is certainly 'used for the support of' the university." *Kinney* at 174, quoting R.C. 3345.17. As for the house rental, we deemed it to be a secondary use and one that supported the university inasmuch as the rental income both paid for expenses of the property and contributed to the general revenue fund of the university. *Id.*

{¶ 26} In *State for Use of Univ. of Cincinnati*, the tax commissioner had determined that a portion of a parcel that had been donated to a state university was not entitled to tax exemption, because buildings on that portion of the property were leased to others for use as a laundromat and a convenience store. The BTA reversed the tax commissioner's decision and determined that the entire parcel, including the leased buildings, was entitled to tax exemption because (1) the university's College of Design, Art, Architecture, and Planning was using the major portion of the property, (2) the university had plans to use the remaining portion of the property, which contained the leased buildings, and (3) the rental payments from the leased buildings went into the university's general fund. We affirmed the BTA's decision.

{¶ 27} More recently, in *Columbus City School Dist.*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557, OSU failed to obtain exemption for one of its properties. In that case, OSU sought exemption for a donated building with commercially leased space on the lower two floors and four rented residential apartments on the upper floor. The donation contemplated OSU's using the building to support fellowships in veterinary medicine. The university sought exemption under R.C. 3345.17, and the tax commissioner and the BTA granted it over the school board's objections. On appeal, we reversed. We distinguished the earlier cases by noting that neither case exempted property solely because the income that was generated from the use of the property became general funds of the university. *Id.* at ¶ 26. Instead, the income-producing activity was a secondary use in the earlier cases. We articulated the principle that "an ancillary use of

property that generates income does not defeat exemption as long as the property is used, to some degree, either currently or prospectively, in a way that operationally relates to university activities." *Id*. at ¶ 27. Because the property at issue was used by the university *solely* to generate income for the scholarship program and the use lacked an operational relationship to OSU's activities, it did *not* qualify for exemption.

{¶ 28} Here, we conclude that OSU may predicate the airport's exemption under R.C. 3345.17 on the operational relationship between the use of the airport and OSU's activities. The operational relationship in this case is twofold: (1) organizational, based on the complete integration of the airport into OSU's College of Engineering and (2) functional, based on educational and research activity conducted by OSU on the airport property. We turn now to O'Keeffe's argument regarding the primary and secondary uses of the property.

*3. OSU demonstrated that operating a public airport supports its educational programs*

{¶ 29} O'Keeffe maintains that "[s]ince OSU Airport became a public airport, the property has been primarily developed and is used primarily for non-university purposes to produce income."[3] In support of this assertion, O'Keeffe calculates the fractional shares of the property devoted to the different uses and then compares the property's use for distinctly educational functions, which he categorizes as exempt under R.C. 3345.17, to its use for general airport functions, which he categorizes as nonexempt under R.C. 3345.17. He also looks at the distinctly educational as opposed to general public use of particular areas. By

---

3. The record does not support O'Keeffe's assertion of a primary use to generate income. This is so for two reasons. First, as O'Keeffe emphasizes, income generated by the airport cannot go into the university's general fund but must instead go into a specific fund for the airport. Second, the profit-and-loss statements in the record indicate that the airport operates at a loss.

categorizing the uses in this way, O'Keeffe is able to argue that the exempt use is not the primary use of the property.

{¶ 30} The "primary use" test is most frequently used in the context of personal-property taxation "to address those situations where there may be operations that would provide an exception from taxation * * * and other operations that would require levying the tax." *Parisi Transp. Co. v. Wilkins*, 102 Ohio St.3d 278, 2004-Ohio-2952, 809 N.E.2d 1126, ¶ 22. Primary use may be established quantitatively as the "measure of the relative time [the item] is utilized in a taxable and a nontaxable capacity," *Ace Steel Baling, Inc. v. Porterfield*, 19 Ohio St.2d 137, 249 N.E.2d 892 (1969), paragraph two of the syllabus, subject to the showing of a qualitative "primacy in utility or essentiality" of a particular use, *id*. at 140-141. A plurality of this court has recognized an analogous primary-use test in the context of real-property-tax exemption. *Faith Fellowship Ministries, Inc. v. Limbach*, 32 Ohio St.3d 432, 437, 513 N.E.2d 1340 (1987) (plurality opinion). And as noted above, a secondary use of property held for the use and benefit of a state university does not defeat an R.C. 3345.17 exemption. *Kinney*, 5 Ohio St.3d at 174, 449 N.E.2d 1282.

{¶ 31} Here, O'Keeffe offers a quantitative analysis of the use of the airport parcel based upon the physical areas of the airport devoted to different uses and the percentage of educational use of each particular area. But his analysis fails because, in quantifying the use of the property, O'Keeffe does not compare the portions leased for private use (arguably a "taxable operation") to the portions used for distinctly exempt purposes. Instead, he compares *public-airport use* to *specifically educational use*. He calculates the specifically educational use as 10 percent of the total use of the airport. Thus, O'Keeffe's basis for claiming that the property is taxable is his determination that 90 percent of the airport use *is general aviation use by the public.*

**{¶ 32}** We reject this argument for two reasons. First, through the testimony of the airport's director, Hammon, and the College of Engineering's finance director, OSU presented evidence that operating the public airport enhanced its educational programs in a direct and significant manner. Student flight education, the course in airport management, and the course in airport planning and design are three examples of how OSU's operating a public airport directly serves educational purposes. Hammon testified that offering those classes at the airport "gives students firsthand contact with the things they're learning in the classroom": students "observe the facilities, observe the activities taking place and then get[] involved with that firsthand," which "supports what they're learning in the classroom." By operating a public airport, OSU affords students hands-on involvement with airport operations through class projects, research projects, and employment at the airport. Additionally, operating a public airport serves OSU's educational-outreach mission: about 3,000 students in grades K through 12 visit the airport every year through field trips, job shadowing, and aviation and space camps.

**{¶ 33}** Hammon also testified that of the approximately 100 employees who maintain airport operations, 35 are student employees. Moreover, because, according to Hammon, the airport regards its primary mission as supporting OSU's "learning, discovery and engagement initiatives," students have access to and can observe an actual full-service airport in operation for learning purposes, which would be "very difficult or * * * impossible" to achieve at a nonuniversity airport.

**{¶ 34}** In addition, the airport is used by the university to conduct research; the largest research project relates to airport safety, and Hammon testified that without the mix of aircraft and the level of aircraft supported by the airport, the research would not be "relevant to what's happening out there today." Also, there are two research facilities on the airport property: a gas-turbine lab and an aerospace-research center.

{¶ 35} In sum, because operating a public airport directly serves OSU's educational and research programs, O'Keeffe's assertion that airport use is distinct from educational use is tenuous on this record.

{¶ 36} Furthermore, to the extent that public-airport use can properly be distinguished from use in support of educational programs, the use of publicly owned property as a public airport is, in itself, a nontaxable rather than a taxable use of the property. Ohio law provides, apart from R.C. 3345.17, at least two bases for exempting airports in this state. Property used as a public airport may be exempt from taxation either as public property used exclusively for a public purpose under R.C. 5709.08, *see Cleveland v. Perk*, 29 Ohio St.2d 161, 280 N.E.2d 653 (1972), or as port-authority property used for an authorized purpose under R.C. 4582.20 and 4582.46, *see Columbus City School Dist. Bd. of Edn. v. Levin,* BTA No. 2010-1292, 2013 WL 6833207 (Oct. 16, 2013) (exempting property adjacent to Rickenbacker Airport that had been acquired by the Columbus Regional Airport Authority); *compare Rickenbacker Port Auth. v. Limbach*, 64 Ohio St.3d 628, 597 N.E.2d 494 (1992) (port-authority property leased to a third party for more than a year not entitled to port-authority exemption).

{¶ 37} In OSU's initial response to O'Keeffe's complaint against exemption, it mainly relied on R.C. 3345.17, but it also cited the exemption in R.C. 5709.08(A)(1), which provides that "[r]eal * * * property belonging to the state or United States used exclusively for a public purpose, and public property used exclusively for a public purpose, shall be exempt from taxation." Given that the parcel at issue is titled in the name of the state of Ohio and operated by a state instrumentality, the portions of the airport that are not leased for private use would qualify for exemption under R.C. 5709.08. *Perk*, 29 Ohio St.2d 161, 280 N.E.2d 653.

{¶ 38} Although OSU has abandoned R.C. 5709.08 as a distinct basis for exemption, the operation of the airport as a public facility—given that the land is

owned by the state—does not count against exemption under R.C. 3345.17 as a "taxable operation," because the airport use itself qualifies as an exempt "public purpose." The primary-use test does *not* involve measuring the uses that bear an operational relationship with OSU activities against all other uses, both taxable and exempt; instead, the test calls for measuring "operations that would provide an exception from taxation" against "other operations *that would require levying the tax*." (Emphasis added.) *Parisi*, 102 Ohio St.3d 278, 2004-Ohio-2952, 809 N.E.2d 1126, at ¶ 22; *accord Ace Steel Baling*, 19 Ohio St.2d 137, 249 N.E.2d 892, at paragraph two of the syllabus (holding that the determination of the primary use of equipment is based in part on the "measure of the relative time it is utilized in a *taxable and a nontaxable* capacity" [emphasis added]).

{¶ 39} For the foregoing reasons, and based on the record in this case, we reject O'Keeffe's second proposition of law and hold that the BTA acted reasonably and lawfully by allowing the exemption.

## C. Under R.C. 3345.17, hangars and offices leased for private use need not be split-listed as taxable

{¶ 40} Under R.C. 5713.04, when a parcel with a single owner is partly used for exempt purposes and partly for taxable purposes, "the listing * * * shall be split, and the part thereof used exclusively for an exempt purpose shall * * * be listed as exempt, and the balance thereof used for a purpose not exempt shall * * * be listed at its taxable value and taxed accordingly." In his third proposition of law, O'Keeffe maintains that "[s]plit-listing under R.C. 5713.04 applies to equitably resolve a complex property tax situation in a Complaint Against Continued Exemption like this one." He asserts that the parts of the airport that are "leased or otherwise used solely to produce income" should be listed as taxable.

{¶ 41} In considering this proposition of law, we first resolve a procedural point. OSU argues that O'Keeffe waived the split-listing issue by not mentioning it in his main brief at the BTA. In making this argument, OSU acknowledges that

O'Keeffe did advance the argument in his notice of appeal to the BTA, his reply brief at the BTA, and his notice of appeal to this court.

{¶ 42} "[T]he omission of an argument from a party's brief may be deemed to waive that argument" at the BTA. *HealthSouth Corp. v. Levin*, 121 Ohio St.3d 282, 2009-Ohio-584, 903 N.E.2d 1179, ¶ 18, fn. 2. We conclude, however, that there was no waiver here. O'Keeffe first raised the issue of partial exemption in his complaint, and he renewed the point in his notice of appeal and reply brief at the BTA. And significantly, O'Keeffe's complaint gave rise to OSU's burden to show entitlement to exemption while also triggering the state's duty to "determine whether the property is subject to taxation or exempt therefrom" under R.C. 5715.27(F)—a duty that in this context, logically encompasses R.C. 5713.04's requirement that the tax commissioner split-list a single real-estate parcel if he finds that it is subject in part to exempt uses and in part to nonexempt ones. That duty, coupled with the fact that O'Keeffe expressly asserted a partial-exemption argument in his complaint, his notice of appeal to the BTA, and his reply brief at the BTA, put the split-listing issue squarely before the BTA. When O'Keeffe asserted the issue again in his notice of appeal to this court, he invoked our jurisdiction to consider it. Under these circumstances, we conclude that the issue was not waived, and we turn now to reviewing the merits of the issue.

{¶ 43} Under the case law, R.C. 3345.17 does not require split-listing of rent-generating portions of property. Indeed, in *State for Use of Univ. of Cincinnati*, 51 Ohio St.3d 6, 553 N.E.2d 1056, the tax commissioner had split-listed as taxable those portions of state property held for the benefit of a university that were leased to for-profit businesses. The BTA reversed that decision, and we affirmed the BTA's grant of exemption to the entire property.

{¶ 44} In sum, when applying R.C. 3345.17, the case law regards activities that generate rental income, if deemed secondary or ancillary to uses that bear an operational relationship with university activities, to be consistent with exempting

the property. That result naturally flows from the fact that the ancillary income constitutes monetary "support of" the university under the terms of R.C. 3345.17.

**{¶ 45}** O'Keeffe points to FAA regulations that prohibit airport income from being used for nonairport purposes. Beginning no later than 2006, OSU was unable to devote revenue generated by airport activity to any purpose other than the airport itself. But the status of the airport as an integral part of OSU's College of Engineering means that the airport income, by supporting the airport itself, is funding a university facility with an educational mission. And any airport-related expenses that are defrayed by airport income makes it unnecessary for OSU to spend other university funds on the airport.

**{¶ 46}** Perhaps the strongest argument for split-listing in this context arises from the case law applying the public-use exemption under R.C. 5709.08 to airports, as discussed above. Under R.C. 5709.08, if a portion of a public airport is leased to private persons, that portion "loses its identity as public property used exclusively for a public purpose and is not exempt from taxation." *Carney v. Cleveland*, 173 Ohio St. 56, 180 N.E.2d 14 (1962), paragraph two of the syllabus. In *Carney*, this court refused exemption to hangars leased to private companies under long-term leases; later, in *Perk*, 29 Ohio St.2d at 162, 166, 280 N.E.2d 653, this court extended the doctrine to shorter term percentage leases given to airport concessionaires.

**{¶ 47}** But unlike R.C. 5709.08, R.C. 3345.17 contains no exclusive-use limitation. R.C. 3345.17 does not say that property must be used exclusively in an operational relationship with university activities—indeed, it uses the phrase "used for the support of" the university, and that phrase encompasses the receipt of income from ancillary activities on the property. Based on such a distinction, the BTA has exempted an OSU Airport hangar leased to a private enterprise for a long term. *See Ohio State Univ. Bd. of Trustees v. Limbach*, BTA No. 87-B-729, 1992 WL 88377, *5 (Apr. 24, 1992). Similarly, because there is no view-to-profit

limitation under R.C. 3345.17, cases cited by O'Keeffe that address charitable-use exemptions under R.C. 5709.12(B) do not apply. *See, e.g., Dialysis Ctrs. of Dayton, L.L.C. v. Testa*, 150 Ohio St.3d 208, 2017-Ohio-4269, 80 N.E.3d 477 (charitable-use exemption applied to dialysis clinic itself, but offices in the same building that were leased to physicians had to be split-listed as taxable).

{¶ 48} Applying our precedent interpreting R.C. 3345.17, we hold that the absence of an exclusive-use limitation in R.C. 3345.17 means that there is no split-listing requirement in this context. If a tax parcel is shown to have a primary use for the support of a state university, including a sufficient operational relationship over and above any income-generating function, the entire parcel will qualify for exemption under R.C. 3345.17. Thus, we reject O'Keeffe's third proposition of law.

## IV. CONCLUSION

{¶ 49} For the above reasons, we affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and FISCHER, DONNELLY, and BRUNNER, JJ., concur.

KENNEDY, J., dissents, with an opinion.

DEWINE, J., dissents, with an opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 50} Because the majority has improperly shifted the burden of proof away from appellee, Ohio State University, to establish its entitlement to an exemption from real-property taxes and because the university has failed to carry its burden to demonstrate that the Ohio State University Airport is used primarily for the support of the university's academic mission, I dissent and would reverse the decision of the Board of Tax Appeals ("BTA") allowing the exemption.

{¶ 51} I agree with the facts as stated by the majority, but there are other facts in the record that should be considered in deciding this case.

{¶ 52} The Ohio State University Airport is a facility built upon land owned by the state of Ohio. According to the airport's draft 2017 Master Plan, as of fiscal-year 2016-2017, the airport was the third-busiest towered airport in the state, behind John Glenn Columbus International Airport and Cleveland-Hopkins International Airport. In 2016, the airport supported over 76,000 flight operations with its air-traffic control tower, which is operated by the Federal Aviation Administration. The airport's draft 2017 Master Plan states that "[f]or Fiscal Year 2016-2017, [the airport's air-traffic control tower] ranked 44 in total operations at the nation's 253 Federal Contract Towers and 186 for total operations at all 517 Air Traffic Control Towered airports." (Footnotes omitted.) The clear majority of flight operations at the university airport were itinerate flights, not local users who took off from and returned to the airport in one flight.

{¶ 53} The draft 2017 Master Plan includes the profits and losses for fiscal year 2016-2017. Business revenue—income generated from nonuniversity users such as businesses and the general public—amounted to roughly 85 percent of the airport's total revenue. Business income was approximately $7.3 million, compared to $1.3 million in internal revenue—income generated from student activities and other teaching and research activities that took place at the airport. None of the airport revenue was deposited in the university's general fund.

{¶ 54} The university airport is classified as a general-aviation airport, and it provides a full range of services to its users, including aircraft storage, fuel, food, and rental cars. Of the 160 aircraft based at the airport in 2016, the university owned 19, which it stored in a single hanger. According to the draft 2017 Master Plan, approximately 350 undergraduate and graduate students and 65 faculty members and instructors rely on the airport for classes. In the 2018 spring semester, for example, the university had 11 courses enrolling 76 students that met at the airport.

{¶ 55} The airport's draft 2017 Master Plan indicates that prior to the opening of a new executive terminal, which broke ground in 2017, the airport's teaching and research facility included 16 offices, 4 classrooms, and 6 laboratories. The airport also had a flight-simulation research lab, an unmanned-aerial-systems lab, an aircraft-safety-and-accident-investigation lab, and an aircraft-maintenance-technology training facility. These teaching and research facilities together amounted to about 143,000 square feet. The airport, however, contained approximately 350,000 square feet of office, classroom, simulation-lab, and hangar space (four T-hangars, nine smaller hangars, and a maintenance hangar). In addition, there were three runways and associated facilities, the air-traffic control tower, 190 tie-down parking spaces, eight fuel tanks, an aircraft-rescue-and-firefighting facility, and the open space needed for take-offs and landings.

{¶ 56} None of this tells us precisely how the subject property was used on January 1, 2016, the tax-lien date, and Ohio State, which had ready access to that specific information, chose not to submit that evidence. However, it is manifest from the evidence that is in the record that Ohio State's use of the property to operate the third-busiest towered airport in Ohio with facilities serving numerous business customers and tenants on a day-to-day basis eclipsed the use of the property to provide educational and research opportunities.

{¶ 57} The issue in this case is whether the university-property exemption applies to part or all of the airport for tax year 2016. R.C. 3345.17 exempts "property * * * of the boards of trustees * * * of the state universities * * * and of the state held for the use and benefit of any such institution, which is used for the support of such institution." As the majority correctly explains, R.C. 5715.271 places the burden of proof on Ohio State to demonstrate its entitlement to a tax exemption, even when, as here, it is defending against a complaint to discontinue that exemption.

{¶ 58} Ohio State is a state university, R.C. 3345.011, and there is no real question that the subject property is held by the state for Ohio State's use and benefit. The question, then, is whether the property is used for the support of the university. As the majority acknowledges, to answer this question, this court must conduct a primary-use test, in which we weigh the use of the property for the support of the university against nonuniversity or nonacademic uses. *See* majority opinion at ¶ 24, citing *Ohio State Univ. Bd. of Trustees v. Kinney*, 5 Ohio St.3d 173, 174, 449 N.E.2d 1282 (1983), and at ¶ 38, citing *Ace Steel Baling, Inc. v. Porterfield*, 19 Ohio St.2d 137, 249 N.E.2d 892 (1969), paragraph two of the syllabus.

{¶ 59} We last applied R.C. 3345.17 in *Columbus City School Dist. Bd. of Edn. v. Testa*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557. In that case, Ohio State sought an exemption under R.C. 3345.17 for a building occupied by commercial and residential tenants, arguing that the proceeds from the rents went to a scholarship fund at Ohio State and therefore supported the university. However, we explained that R.C. 3345.17 requires the court to "focus on the use of the property itself" and to determine whether that use is for the support of the university. *Id.* at ¶ 17. We concluded that the property was not "used in ways that operationally support university activities," *id.* at ¶ 28, because it was used primarily for nonuniversity purposes by the tenants (a fast-food restaurant, a credit union, and private residents). Because the nonacademic use of the property for commercial and private tenants predominated over any university uses of the property, the property was not tax exempt under R.C. 3345.17.

{¶ 60} Similarly, the evidence presented here demonstrates that the primary and dominant use of the property is to operate the third-busiest towered airport in this state to service private customers and businesses who are not affiliated with the university and who do not use the property to advance the university's academic mission other than provide revenue for the airport. Although Ohio State presented

evidence showing that students and faculty use the airport for education and research and that numerous degree programs benefit from having access to a general-aviation airport, it failed to present any evidence quantifying how these university uses predominate over the business use. Ohio State points to no evidence that would counter appellant John O'Keeffe's calculation that "90% of [Ohio State University] Airport property is operationally used to serve and produce income from external non-university public General Aviation business customers."

{¶ 61} Ohio State bore the burden to establish a primary nontaxable use. O'Keeffe had no burden to demonstrate what exactly the primary use of the airport was or to prove that use was a taxable one. Ohio State has not rebutted the evidence presented in this case indicating that the primary use of the property is as a general-aviation airport that has a secondary use of serving as a learning laboratory that offers students and faculty the opportunity to have classes and conduct research at the airport and observe the workings of a general-aviation airport.

{¶ 62} This is a case in which the placement of the burden of proof on Ohio State is dispositive. O'Keeffe put the tax-exempt status of the airport property at issue when he filed the complaint challenging Ohio State's exemption. At that point, Ohio State bore the burden of going forward with evidence demonstrating that the primary use of the airport is operationally related to university activities. *See* R.C. 5715.271. However, it failed to produce any evidence quantifying how much the airport was used for teaching and research opportunities and how much it was used for serving the airport's customers. And without that evidence, Ohio State cannot meet its burden of proof.

{¶ 63} The second dissenting opinion misreads this analysis as "an all-or-nothing proposition: either the entire parcel is taxable or the entire parcel is not taxable," second dissenting opinion at ¶ 72, and it would apply R.C. 5713.04, which permits a parcel of property to be split listed when parts of it qualify for exemption and others parts do not. The problem with this position, however, is that the

university specifically argued that "the record does not support such a split-listing, because Ohio State uses its airport in its entirety to support the university and all of its many programs." (Emphasis deleted.) It was the university, then, that chose an "all-or-nothing" approach by expressly disclaiming that R.C. 5713.04 applies to its airport property.

{¶ 64} The majority may be correct that the airport is "integral" to Ohio State's College of Engineering, majority opinion at ¶ 45, but that does not mean the real property itself is part of the university. R.C. 3345.011 defines "state university" as "a public institution of higher education which is a body politic and corporate." It is a fictional entity, like a corporation. As a state university, Ohio State has statutory authority to acquire, construct, and operate facilities. R.C. 3345.11. "Facilities" includes buildings, structures, improvements, real estate, and open-space and green-space areas. R.C. 3345.12(A)(4) (defining "auxiliary facilities"), (A)(5) (defining "education facilities"), and (A)(6) (defining "facilities"). Therefore, the General Assembly has distinguished between a state university and the property and facilities that it owns or that the state holds for the university's use and benefit. And ownership of the property by the university (or by the state on its behalf) standing alone does not necessarily mean the property is entitled to tax exemption, as our decision in *Columbus City School Dist. Bd. of Edn.*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557, indicates, because property owned by a university or held by the state for the university's use and benefit is exempt from taxation under R.C. 3345.17 only if its primary use serves the university's academic mission. Here, there is no evidence that operating an airport would no longer be feasible in the absence of the teaching and research opportunities that the airport provides; common sense says that the airport would continue operations. In contrast, Ohio State presented evidence that without a general-aviation airport, having a learning laboratory for aviation study and

research would be impossible. The use as a general-aviation airport plainly dominates.

**{¶ 65}** The majority conjures a different explanation for why the exemption applies. It asserts that the airport's use as a general-aviation airport does not count against the university in weighing the airport's academic and nonacademic uses, because "the portions of the airport that are not leased for private use would qualify for exemption under R.C. 5709.08," which exempts property of the state used exclusively for a public purpose. Majority opinion at ¶ 37. In other words, there is no need to consider whether the property is used for the support of the university, because the property appears to qualify for the public-use exemption. But that analysis simply assumes, with no factual basis, that any public use, when added to the university use, predominates over the business use of selling fuel and food, renting vehicles, and leasing office space, hangars, and tie-downs to businesses and individuals.

**{¶ 66}** But more importantly, as the majority acknowledges, the university abandoned any argument that the property was exempt from taxation pursuant to R.C. 5709.08. Further, the record does not show that the property has ever been determined to be exempt under that provision. Whether the airport might in fact qualify for the public-use exemption and whether that is relevant in determining whether the university-property exemption applies are questions that the tax commissioner and the BTA did not pass on below and that have not been the subject of adversarial briefing in this court. We should not abandon this court's "role of neutral arbiter of matters the parties present," *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008), by injecting new arguments into this case. As Judge Richard Posner once explained, "we cannot write a party's brief, pronounce ourselves convinced by it, and so rule in the party's favor. That's not how an adversarial system of adjudication works." *Xue Juan Chen v. Holder*, 737 F.3d 1084, 1085 (7th Cir.2013).

{¶ 67} Moreover, the majority's analysis fails to apply the plain language of R.C. 3345.17, the only tax-exemption statute at issue in this case. The only two elements relevant to the exemption here are that (1) the property is held by the state for the use and benefit of the university and (2) the property is used for the support of the university. R.C. 3345.17 does not exempt property used by the university for a public purpose, unless that use also supports the university and its academic mission. We are obligated to strictly construe statutes granting property-tax exemptions, *Case W. Res. Univ. v. Wilkins*, 105 Ohio St.3d 276, 2005-Ohio-1649, 825 N.E.2d 146, ¶ 12, and we "may not rewrite the plain and unambiguous language of a statute under the guise of statutory interpretation," *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 20.

{¶ 68} Rather than consider the plain meaning of R.C. 3345.17, the majority supports its holding by taking two of our cases, *Parisi Transp. Co. v. Wilkins*, 102 Ohio St.3d 278, 2004-Ohio-2952, 809 N.E.2d 1126, and *Ace Steel Baling*, 19 Ohio St.2d 137, 249 N.E.2d 892, out of context. Neither case stands for the proposition advanced by the majority today that the court can simply pick and choose from among the elements of various property-tax-exemption statutes in determining the availability of an exemption under one of them. Rather, those cases simply weigh the taxable use against the nontaxable use to determine which one is primary for purposes of a single, specific exemption.

{¶ 69} The majority pieces together a hybrid exemption from two separate tax-exemption statutes when an exemption for the whole property would not be available under either statute standing alone. But as we explained in *Columbus City School Dist. Bd. of Edn.*, "the fact that R.C. 3345.17 may substantially or completely overlap other exemptions does not furnish a reason to override a clearly intended legislative limitation—in this case, the limitation of R.C. 3345.17 to situations where property is used in ways that operationally support university activities." 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557, at ¶ 28. The

majority today does just that by writing the public-use exemption into R.C. 3345.17 instead of considering whether that public use primarily supports university activities.

{¶ 70} For these reasons, I would hold that Ohio State has failed to meet its burden to demonstrate its entitlement to an exemption from taxation for its airport. As far as the record shows, the property is used as a general-aviation airport where a few university courses meet and where research is conducted. I therefore would reverse the decision of the BTA.

_____

**DeWine, J., dissenting.**

{¶ 71} The question in this case is whether land that contains the Ohio State University ("OSU") Airport qualifies for a tax exemption that is afforded to property used for the support of the university. The airport property is used in a variety of ways. On one end of the spectrum are uses—things like providing classroom space for students—that are integral to the educational mission of the university. On the other end are uses—leasing office space to for-profit corporations, for example—that have little to no discernable connection to the educational mission of the university. And there are other uses that fall somewhere in between.

{¶ 72} Both the majority and the first dissenting opinion treat the question in front of us as largely an all-or-nothing proposition: either the entire parcel is taxable or the entire parcel is not taxable. But that approach is at odds with Ohio law. R.C. 5713.04 ("the split-listing statute") directs that if a parcel is partly used for tax-exempt purposes and partly used for taxable purposes, the listing shall be split and each portion taxed or not taxed according to its use. I would remand the case to the tax commissioner with directions to split list the property.

**Property used for both exempt and nonexempt purposes must be split listed**

{¶ 73} The majority concludes that the entire OSU Airport property is exempt under R.C. 3345.17 (the "university-exemption statute"). That section provides that "property * * * of the state held for the use and benefit of" a state university, "which is used for the support of such institution, is exempt from taxation so long as such property is used for the support of such university."

{¶ 74} I agree with the first dissenting opinion that OSU failed to meet its burden to show that the entire property was exempt under this provision. As the first dissent points out, significant portions of the property are used in a manner that have little connection to the educational mission of the university. But the first dissent is incorrect when it assumes that because OSU failed to demonstrate that the entire property was tax exempt, the entire property should be taxable. To the contrary, the split-listing statute provides that property used for both exempt and nonexempt purposes must be split listed.

{¶ 75} When some parts of a parcel of property qualify for exemption and others would not qualify for exemption on their own, the split-listing statute requires that the property be split listed:

> If a separate parcel of improved or unimproved real property has a single ownership and is so used so that part thereof, if a separate entity, would be exempt from taxation, and the balance thereof would not be exempt from taxation, the listing thereof shall be split, and the part thereof used exclusively for an exempt purpose shall be regarded as a separate entity and be listed as exempt, and the balance thereof used for a purpose not exempt shall, with the approaches thereto, be listed at its taxable value and taxed accordingly.

28

R.C. 5713.04.

{¶ 76} Nothing in this provision excludes university property from its scope. And by its plain terms, the statute applies here. The OSU Airport is used in such a manner that if the parts thereof were owned by separate entities, some parts would be taxable and others would not. For example, no one would seriously dispute that classrooms and other educational facilities would not be taxable if separately considered. On the other hand, the commercial office space, if owned by a separate entity, would plainly be taxable.

{¶ 77} But despite the plain terms of the split-listing statute, the majority determines that split listing is not required because the entire property is exempt under the university-exemption statute. It gets there by misreading our caselaw.

{¶ 78} In determining that the entire property is tax exempt—and that therefore split listing is not required—the majority looks to a trio of cases in which we construed the university-exemption statute: *Ohio State Univ. Bd. of Trustees v. Kinney*, 5 Ohio St.3d 173, 449 N.E.2d 1282 (1983); *State for Use of Univ. of Cincinnati v. Limbach*, 51 Ohio St.3d 6, 553 N.E.2d 1056 (1990); *Columbus City School Dist. Bd. of Edn. v. Testa*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557. In all three of these cases, we made clear that property must be primarily and substantially used for the support of the university to qualify for exemption under that provision. *See Kinney* at 174; *State for Use of Univ. of Cincinnati* at 7-8; *Columbus City School Dist.* at ¶ 23, 26.

{¶ 79} We upheld the exemption in the first two cases even though a portion of the property in each case was leased to nonuniversity users. At issue in *Kinney* was a house adjacent to the OSU Airport that was leased to individuals with no connection to the university. And in *State for Use of Univ. of Cincinnati*, small portions of the property were leased for use as a laundromat and a convenience store. But in *Columbus City School Dist.*, we held that property owned by OSU

that benefited the university only through the generation of revenue did not qualify for the exemption.

{¶ 80} The principle that explains the differing results in the three cases is that the property itself must be used for the benefit of the university; using revenues generated by a piece of property to benefit the university is not enough. In both *Kinney* and *State for Use of Univ. of Cincinnati*, we concluded that in addition to producing income for the university, the challenged portions of the property themselves had an operational use that supported the university. *See Kinney* at 174; *State for Use of Univ. of Cincinnati* at 8.

{¶ 81} And in *Columbus City School Dist.*, we made clear that it is the actual use of the property that is critical. We explained that in *Kinney*, we had "specifically declared that the use of the house and grounds as rental property was a *secondary* use." (Emphasis in original.) *Columbus City School Dist.*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557, at ¶ 26. And while we had noted in *State for Use of Univ. of Cincinnati* that the commercial use of the property encompassed only 12 percent of the entire parcel, we emphasized in *Columbus City School Dist.* that that portion of the property "was also subject to both current and prospective uses that supported university activities apart from the generation of any income." *Id.* at ¶ 26. Thus, we concluded that "an ancillary use of property that generates income does not defeat exemption as long as the property is used, to some degree, either currently or prospectively, in a way that operationally relates to university activities." *Id.* at ¶ 27. The focus, we explained, must be on the use of the property itself; in other words, courts must consider whether "the activity conducted on the property bears an operational relationship to university activities." *Id.* at ¶ 2.

{¶ 82} The majority cites this line of cases but then reaches a result in direct contradiction to their central holding. It notes that under R.C. 5709.08—the exemption statute that deals with public property used exclusively for a public

purpose—airport property leased to third parties is not exempt from taxation. It then says that the same principle does not apply here, because unlike R.C. 5709.08, the university-exemption statute does not contain an exclusive-use requirement and instead "uses the phrase 'used for the support of' the university, and that phrase encompasses the receipt of income from ancillary activities on the property." Majority opinion at ¶ 47. Similarly, it says that "ancillary income [from rents] constitutes monetary 'support of' the university under the terms of R.C. 3345.17." *Id.* at ¶ 44. But, of course, this is directly at odds with what we said in *Columbus City School Dist.*: "The statute notably does not explicitly allow or tie the exemption to the use of *income* from the property, but rather to the use *of the property itself.*" (Emphasis in original.) *Id.* at ¶ 15; *see also id.* at ¶ 19 ("The General Assembly ultimately opted for an exemption based on the use of the property, not on the use of its proceeds").

{¶ 83} Thus, to establish its entitlement to an exemption under R.C. 3345.17, OSU must demonstrate that the property is actually being used in a manner that supports the university. If some portions of the property do not qualify for exemption, the property is subject to mandatory split listing under R.C. 5713.04.

**The tax commissioner and the BTA failed to consider whether each portion of the parcel was being used in a manner that qualifies for tax exemption**

{¶ 84} Both the tax commissioner and the Board of Tax Appeals ("BTA") applied the university-exemption statute to the parcel as a whole without evaluating whether each of the discrete portions of the parcel were being used in a manner that operationally supports the university.[4] Likewise, the majority concludes that the entire parcel has an operational relationship with the university that can be

---

1. Certain portions of the parcel were not addressed by the briefing or evidence at all. For instance, the record suggests that the city of Columbus leases a portion of the airport for use as a fire station. No evidence has been presented as to whether this portion of the property qualifies for exemption under R.C. 3345.17 or any other provision.

characterized as "organizational, based on the complete integration of the airport into OSU's College of Engineering," and "functional, based on educational and research activity conducted by OSU on the airport property." Majority opinion at ¶ 28.

{¶ 85} It is undisputed that the parcel contains educational facilities used for university instruction, including classrooms and simulation laboratories. The property also houses two university research facilities: a gas-turbine lab and an aerospace-research center. These facilities plainly qualify as property being used for the support of the university. But it does not follow that the entire parcel is exempt simply because some part of it is being used primarily for the support of the university's educational and research missions.

{¶ 86} The majority disregards the fact that many portions of the property are used for activities that do nothing to support the university and instead relate primarily to the use of the airport by the public. Take, for instance, the portion of the property used to house an Enterprise car-rental service. Or consider the Barnstormer Restaurant located at the airport. How are these segments being used to operationally support the university? The evidence on that question is pretty thin: according to the airport director, having these types of services at the airport provides students with an "understanding * * * of how to deal with those types of operations." And, as the director further explained, the presence of food services at the airport supports the university by ensuring that students have something to eat when they are working at the airport.

{¶ 87} Just because property containing car-rental and food-service businesses might be said to provide some tenuous benefit to students does not mean that the property is being used for the support of the university. To the contrary, the evidence indicates that these operations are part of the full range of services that the airport offers to all its aeronautical users. They provide revenue streams for the airport. Indeed, the airport's 1990 "Master Plan Update" articulated a desire to

install a restaurant "to maximize the economic return of the property in the terminal area to benefit the Airport" and renovate the customer service area "to better serve transient corporate aviation customers." The plan also predicted that "an increasing number of executive (corporate), business and personal general aviation travelers" would utilize the airport, creating a demand for expanded rental-car services, among other things.

{¶ 88} The connection between the use of property leased by the airport to private companies—such as Cardinal Health, Inc., Worthington Industries, and Advanced Drainage Systems—and the support of the university is even more tenuous. OSU insists that the property subject to these leases is still being used for the support of the university. In its view, the airport needs private businesses to generate revenue and air traffic in order to maintain its general-aviation status with the Federal Aviation Administration and the students benefit from having access to a general-aviation airport, so the existence of the commercial leases inevitably supports the university.

{¶ 89} But this rationale disregards the university-exemption statute's focus on the *use* of the property itself. The record is devoid of evidence that the property leased by the corporate entities is being used in a way that supports the university. There is no evidence demonstrating that "the activity conducted on the property"—which consists of hangars and office space rented by independent corporate entities—"bears an operational relationship to university activities," *Columbus City School Dist.*, 130 Ohio St.3d 344, 2011-Ohio-5534, 958 N.E.2d 557, at ¶ 2. Indeed, under at least one of the leases in place at the airport, the commercial tenant—not OSU—would be on the hook for taxes if the property were to lose its exemption. And "allowing an exemption for property leased to a commercial tenant is particularly troubling, since it makes the tax exemption inure to the benefit of a commercial enterprise rather than the intended nonprofit beneficiary." *Id.* at ¶ 27.

33

{¶ 90} The majority glosses over any real examination of the uses of the component parts of the airport with the conclusory assertion that the use of the airport is operationally related to university activities "based on the complete integration of the airport into OSU's College of Engineering." Majority opinion at ¶ 28. In the majority's view, it doesn't matter if some portions of the challenged parcel are not used for the support of the university; because the airport is considered to be "part of" OSU's College of Engineering, anything that benefits the airport automatically supports the university. Majority opinion at ¶ 45. Of course, under that line of thinking, virtually any property owned by OSU could qualify for exemption as long as the university puts that property under the umbrella of one of its departments. Suppose the university wanted to acquire a shopping center. All the university would have to do to get a tax exemption would be to make the shopping center "part of" its College of Business.

{¶ 91} The bulk of the testimony presented by OSU, as well as the analysis of the BTA, centered on the ways in which university students benefit from having access to the airport and the difficulties the university would face if it had to seek that access elsewhere. But university students benefit from a great many things: some students may feel their college experience greatly enhanced by evenings at the Out-R-Inn, but one would hardly say that that watering hole is used for the support of the university. The question under the university-exemption statute is not whether students benefit from using the property—it is whether the *property* is being used *for the support of* the university. The fact that operating the airport assists the university in providing educational opportunities to some of its students does not necessarily mean that the entire property is being used for the support of the university. The appropriate analysis should focus on the specific uses of each portion of the property to determine whether such uses operationally support the university.

**Conclusion**

{¶ 92} The tax commissioner and the BTA failed to consider the different uses of each distinct portion of the parcel being challenged when evaluating whether the property was entitled to exemption under R.C. 3345.17. Some portions of the property are not addressed by the briefing at all. I would therefore remand the case to the tax commissioner to evaluate each part of the property and determine which portions are used primarily for the support of the university. Any portions of the property that do not qualify for exemption should be listed separately and taxed pursuant to R.C. 5713.04.

_____

Sandra J. Dickinson, for appellant.

Vorys, Sater, Seymour & Pease, L.L.P., Hilary J. Houston, Nicholas M.J. Ray, and Lindsay Doss Spillman, for appellee the Ohio State University.

Dave Yost, Attorney General, and Kimberly G. Allison, Assistant Attorney General, for appellee Tax Commissioner.

_____